Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
01/30/2024 09:06 AM CST

- 578 -

**Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports**
IN RE INTEREST OF CAMERON L. & DAVID L.
Cite as 32 Neb. App. 578

**In re Interest of Cameron L. and David L.,
children under 18 years of age.
State of Nebraska, appellee,
v. Clarissa L., appellant.**

___ N.W.2d ___

Filed January 23, 2024.    No. A-23-377.

1. **Juvenile Courts: Appeal and Error.** An appellate court reviews juvenile cases, including those under the Nebraska Indian Child Welfare Act, de novo on the record and reaches its conclusions independently of the juvenile court's findings in a termination of parental rights case.

2. **Parental Rights: Proof.** To terminate parental rights, it is the State's burden to show by clear and convincing evidence both that one of the statutory bases enumerated in Neb. Rev. Stat. § 43-292 (Reissue 2016) exists and that termination is in the child's best interests.

3. **Indian Child Welfare Act: Parental Rights: Proof: Expert Witnesses.** The Nebraska Indian Child Welfare Act adds two additional elements the State must prove before terminating parental rights in cases involving Indian children. First, the State must prove by clear and convincing evidence that active efforts have been made to prevent the breakup of the Indian family and that these efforts have proved unsuccessful. Second, the State must prove by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

4. **Trial: Evidence: Appeal and Error.** To preserve a claimed error in admission of evidence, a litigant must make a timely objection that specifies the ground of the objection to the offered evidence.

5. **Trial: Expert Witnesses: Appeal and Error.** A trial court is allowed discretion in determining whether a witness is qualified to testify as an expert, and unless the court's finding is clearly erroneous, such a determination will not be disturbed on appeal.

- 579 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF CAMERON L. & DAVID L.
Cite as 32 Neb. App. 578

6. **Parental Rights: Proof.** Neb. Rev. Stat. § 43-292(7) (Reissue 2016) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent.

7. **Parental Rights.** In a case of termination of parental rights based on Neb. Rev. Stat. § 43-292(7) (Reissue 2016), the protection afforded the rights of the parent comes in the best interests step of the analysis.

8. **Parental Rights: Evidence: Appeal and Error.** If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in Neb. Rev. Stat. § 43-292 (Reissue 2016), the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground.

9. **Parental Rights: Proof.** In addition to proving a statutory ground, the State must show that termination of parental rights is in the best interests of the children.

10. **Constitutional Law: Parental Rights: Proof.** A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must show that the parent is unfit.

11. **Parental Rights: Presumptions: Proof.** There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit.

12. **Parental Rights.** The best interests analysis and the parental fitness analysis are fact-intensive inquiries. And while both are separate inquiries, each examines essentially the same underlying facts as the other.

13. **Parental Rights: Parent and Child.** In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child.

14. **Parental Rights: Appeal and Error.** Where termination of parental rights is based on Neb. Rev. Stat. § 43-292(7) (Reissue 2016), appellate courts must be particularly diligent in their de novo review of whether termination of parental rights is in fact in the child's best interests.

15. **Parental Rights.** Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights.

16. ____. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity.

- 580 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF CAMERON L. & DAVID L.
Cite as 32 Neb. App. 578

Appeal from the Separate Juvenile Court of Lancaster County: Shellie D. Sabata, Judge. Affirmed.

Jonathan Seagrass, Jennifer Gaughan, Abby Kuntz, Patrick Carraher, and Mark Bestul, of Legal Aid of Nebraska, for appellant.

Tara A. Parpart, Deputy Lancaster County Attorney, for appellee.

Joy Kathurima and Rose Godinez for amicus curiae ACLU of Nebraska Foundation.

Pirtle, Chief Judge, and Moore and Arterburn, Judges.

Moore, Judge.

## I. INTRODUCTION

Clarissa L. appeals from an order of the separate juvenile court of Lancaster County, terminating her parental rights to two of her children. Clarissa assigns that the State failed to prove beyond a reasonable doubt, as required by the Indian Child Welfare Act (ICWA) and the Nebraska Indian Child Welfare Act (NICWA), through qualified expert witness testimony, that the continued custody of the children by Clarissa was likely to result in serious emotional or physical damage to them. Clarissa also assigns that the termination of her parental rights was not in the children's best interests. Upon our de novo review of the record, we affirm the juvenile court's order.

## II. STATEMENT OF FACTS

### 1. Procedural Background

Clarissa is the biological mother of David L., born in December 2014, and Cameron L., born July 2016. Clarissa is also the mother of Qlani L., born in September 2005, and Dazianna L., born in October 2007. Though Qlani and Dazianna were removed from Clarissa's care along with David and Cameron and named in the petition, the motion

- 581 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF CAMERON L. & DAVID L.
Cite as 32 Neb. App. 578

for termination of Clarissa's parental rights and subsequent order relate only to David and Cameron. All four children share the same biological father. As discussed further below, the father's parental rights to David and Cameron were terminated during these same proceedings, and we discuss him only as necessary to the resolution of the current appeal by Clarissa.

Qlani, Dazianna, David, and Cameron were removed from Clarissa's care by law enforcement on February 14, 2020, after Clarissa was found intoxicated on a city bus and was placed into a "detox" facility. There were additional reports that Clarissa had hit either David or Cameron and frequently left them unsupervised at a family homeless shelter. A petition was filed on February 18 to adjudicate all four children pursuant to Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016), based on Clarissa's subjecting the children to excessive physical discipline and becoming so intoxicated that she was unable or unwilling to provide adequate care to the children, placing them at risk of harm. That same day, the juvenile court entered an ex parte order for temporary emergency custody, placing the four children in the care of the Nebraska Department of Health and Human Services (the Department).

An order entered on February 19, 2020, reflects that at a hearing held that day, the juvenile court inquired as to whether Indian children were involved in the proceedings and directed the State and the Department to give notice to the appropriate identified tribe pursuant to NICWA. The order lists the Oglala Sioux Tribe (the Tribe) as the tribe on record. Also at this hearing, Clarissa was appointed a guardian ad litem, though the reason for the appointment is unclear from our record.

On March 2, 2020, the State filed an "ICWA Notice" addressed to the ICWA administrator of the Tribe; the Aberdeen, South Dakota, regional director of the Bureau of Indian Affairs; Clarissa; and the father. The notice stated that proceedings regarding the four children had begun in

- 582 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF CAMERON L. & DAVID L.
Cite as 32 Neb. App. 578

the juvenile court and that it was believed both David and Cameron were eligible for enrollment in the Tribe. Qlani and Dazianna were already enrolled members. Both Clarissa and the father were listed in the notice as enrolled members of the Tribe. The notice further indicated that a temporary custody hearing was scheduled for March 25. The State subsequently filed affidavits evidencing that the notices had been mailed.

The adjudication hearing scheduled for March 2020 was continued to April 29, due to the COVID-19 pandemic. On March 27, the State filed another "ICWA Notice" addressed to the same individuals, indicating the date of the continued temporary custody hearing, and the State subsequently filed affidavits of notice evidencing that the notices had been mailed. The address and individual recipient listed by the State for the Tribe in this second ICWA notice is different than that included in the first.

An order entered on May 8, 2020, indicated that a temporary custody and adjudication hearing was held on April 29. A bill of exceptions from this hearing does not appear in our record on appeal. A representative of the Tribe appeared telephonically at the hearing, and the juvenile court received a "Certificate of Indian Blood" for both Qlani and Dazianna. Clarissa entered a denial of the allegations contained in the petition. The representative requested leave on behalf of the Tribe to intervene in these proceedings as to Qlani and Dazianna, which the court granted. The representative then advised the court that the Tribe did not object to the temporary custody hearing proceedings and did not object to Shirley Bad Wound providing qualified expert witness testimony, and Bad Wound made statements to the court. The hearing was continued to May 6.

In its May 8, 2020, order, the juvenile court found that active efforts were being made to prevent continued removal of Qlani, Dazianna, David, and Cameron from the parental home, and to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian

- 583 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF CAMERON L. & DAVID L.
Cite as 32 Neb. App. 578

family. Specifically, the court identified these efforts to include an initial diagnostic interview, a substance use evaluation, substance abuse treatment, drug and alcohol testing, "an EDN assessment, CPP assessments, trauma assessments, and a Smart Talk phone." The court also found by clear and convincing evidence, including the testimony of a qualified expert witness, that returning legal and physical custody of the four children to a parent would be contrary to the health, safety, and welfare of the juveniles and likely result in "serious physical or emotional harm" to the children. The court ordered the four children to remain in the temporary legal and physical custody of the Department. The court further ordered that the Department should investigate ICWA priority placements in consultation with the Tribe.

A contested adjudication trial was held on June 22, 2020, and an order was entered that same day. A bill of exceptions from this hearing does not appear in our record on appeal. The juvenile court found that the allegations of the petition regarding Clarissa were true by a preponderance of evidence. The court ordered that Clarissa cooperate with a co-occurring evaluation, that she not possess or consume alcohol or controlled substances and submit to random drug and alcohol testing, and that the Department provide Clarissa with any treatment and services recommended by her evaluations and continue to investigate ICWA priority placements for the four children in consultation with the Tribe.

The juvenile court entered a dispositional order for Clarissa on August 8, 2020, adopting the case plan presented by the Department as modified. This specific case plan is not included in our record. The court ordered that Clarissa participate in co-occurring residential treatment to address her drug use and mental health needs, submit to random drug and alcohol testing, not possess or consume alcohol or controlled substances, maintain a legal means of support and a safe and stable home for the children, and participate in supervised

- 584 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF CAMERON L. & DAVID L.
Cite as 32 Neb. App. 578

parenting time with the children as arranged and approved by the Department.

On October 21, 2020, the Department filed a motion to suspend weekly visitation between Clarissa and the four children. In an attached affidavit, the family's caseworker at the time described Clarissa's inappropriate behavior during visitation, including using profane language, expressing delusional thinking, disparaging the children's father, and coaching the children to report abuse from their foster parent. Clarissa was not able to be redirected. Additionally, she had threatened the family support worker and was arrested after trespassing at the foster parent's home. The children's therapist at the time recommended to the caseworker a cessation of Clarissa's visits until Clarissa addressed her mental health and substance use issues. An order entered by the juvenile court the same day suspended Clarissa's visitation until further order by the court.

Several review hearings were held during the case, occurring on October 5, 2020; January 5, February 26, May 3, November 2, and December 13, 2021; and January 26, February 9, May 17, August 2, and November 1, 2022. At the October 2020 review hearing, the juvenile court modified the dispositional plan to order that the Department arrange sibling visitation, because the four children had not been placed in the same foster home. David and Cameron have been placed in the same foster homes throughout the entirety of the case. At the January 2021 review hearing, the juvenile court again modified the dispositional plan to order that Clarissa have only therapeutic contact with the children and complete a psychological evaluation, with a substance use component, and a parenting assessment. The rehabilitative case plan goals for Clarissa have been consistent throughout the case, including that she abstain from using alcohol and controlled substances and participate in short-term residential treatment.

At the February 2021 review hearing, the juvenile court found that a primary permanency plan for all four children

- 585 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF CAMERON L. & DAVID L.
Cite as 32 Neb. App. 578

of guardianship, with a concurrent plan of reunification with a parent, was appropriate. At the May 2021 review hearing, the court found an exception to the statutory requirement that the State file a motion for the termination of parental rights at that point in the proceedings, as doing so would not be in the best interests of the children given the primary permanency plan of guardianship. In the order reflecting the February 2022 review hearing, the court listed the primary permanency plan as "guardianship/adoption," with a concurrent plan of reunification, but in orders reflecting subsequent review hearings, the primary permanency plan includes only guardianship.

On January 18, 2023, the State filed a supplemental petition, including an allegation against the children's father, and a motion for termination of Clarissa's and the father's rights to David and Cameron, alleging statutory grounds to terminate Clarissa's rights existed pursuant to Neb. Rev. Stat. § 43-292(1), (2), (6), (7), and (9) (Reissue 2016) and to terminate the father's rights existed pursuant to § 43-292(1), (2), (7), and (9). The motion alleged that termination of the parents' rights was in the best interests of the children.

On February 2, 2023, the State sent an ICWA notice to the Tribe, the Aberdeen regional director of the Bureau of Indian Affairs, Clarissa, and the father. The notice attached the supplemental petition and motion for termination of parental rights, detailed the date of the termination trial, and stated that David and Cameron may be eligible for membership in the Tribe. The State filed an affidavit and notice on February 7, evidencing that the ICWA notice had been mailed to both the Tribe and the Aberdeen regional director. In later affidavits, the State attached certified mail receipts showing that the ICWA notice had been received by the Aberdeen regional director on February 6 and the Tribe on February 9.

On March 3, 2023, Clarissa filed a notice of tribal eligibility and attached a letter from the Tribe's ICWA technician stating that both David and Cameron were eligible for enrollment in the Tribe.

- 586 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF CAMERON L. & DAVID L.
Cite as 32 Neb. App. 578

An order entered on March 10, 2023, memorialized a hearing held earlier that day. A bill of exceptions from this hearing is not included in our record on appeal. At the hearing, the juvenile court received the tribal eligibility letter into evidence. Clarissa requested that the court find David and Cameron to be "Indian children as defined by [ICWA]." Based on the parties' stipulation that the biological parents are enrolled members of the Tribe and the tribal eligibility letter, the court found that "the [ICWA] provisions apply to Cameron and David from this date forward." The court further noted that because it was previously determined that ICWA applied to Qlani and Dazianna, the court had made findings regarding active efforts throughout the duration of the case. The Tribe did not intervene on behalf of David and Cameron as it had for their older siblings.

## 2. Trial

A termination trial was held on April 13, 2023. No representative from the Tribe appeared at trial. The following evidence regarding Clarissa, David, and Cameron was adduced.

### (a) Clarissa's Case Progress

Connie Nemec, the family's caseworker since May 2021, testified to Clarissa's progress with the dispositional plan.

Clarissa had several contacts with law enforcement throughout the juvenile case. The Department's case plans demonstrate that from July 2020 to November 2021, Clarissa was charged with concealing merchandise, loitering and trespassing, and possession of a controlled substance, though it is unclear whether these charges resulted in any convictions. In December 2021, she was charged with entering a motor vehicle without permission and "served fines" for her November 2021 possession conviction. In March 2022, Clarissa was charged with possession of a controlled substance, criminal trespass, and criminal mischief, for which convictions she was sentenced to 60 days' incarceration. In May 2022, Clarissa was charged with possession of a controlled substance, for which

- 587 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF CAMERON L. & DAVID L.
Cite as 32 Neb. App. 578

conviction she was sentenced to 40 days' incarceration. In July 2022, Clarissa was charged with possession of a controlled substance and burglary, for which convictions she was fined $200 and sentenced to 40 days' incarceration. At the time of trial, Clarissa had a pending theft by unlawful taking charge from October 2022.

Clarissa's contact with Nemec was sporadic. Though when Clarissa was incarcerated, she had frequent conversations with Nemec where she asked for assistance in accessing services and admitted to methamphetamine use and to her need for residential treatment. Clarissa maintained consistent contact with Nemec from October 2022 to March 2023, during which Clarissa would ask about the well-being of David and Cameron.

Clarissa completed a substance use evaluation at a psychiatric hospital in January 2021. The substance use evaluation initially recommended that Clarissa attend a co-occurring intensive outpatient treatment program. However, soon after starting intensive outpatient treatment, Clarissa reported to her provider that she was "hungover" and had recently used substances. In a February 2021 letter to the Department, Clarissa's provider diagnosed her with "Social Anxiety Disorder, Unspecified Trauma and Stressor Related Disorder," and various substance use disorders, and the provider recommended that Clarissa participate in short-term residential treatment. The evaluation and followup letter are attached to the Department's February 2021 case plan.

On October 10, 2022, Clarissa was jailed for her theft by unlawful taking charge. Clarissa participated in a co-occurring evaluation in February 2023 while she was incarcerated. The evaluator found that Clarissa met the full diagnostic criteria for having a stimulant use disorder and an alcohol use disorder. The evaluation recommended that Clarissa participate in long-term residential treatment in which she could remain in a supportive, sober environment to reduce the risk of relapse and change behavioral and cognitive patterns that

- 588 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF CAMERON L. & DAVID L.
Cite as 32 Neb. App. 578

reinforced her substance use. It was also recommended that, following discharge, Clarissa should participate in a "step down" treatment to maintain accountability and support. The co-occurring evaluation was attached to the Department's March 2023 case plan.

Clarissa entered St. Monica's for residential substance use treatment in late February 2023. Nemec stated that though Clarissa had an outstanding warrant connected to a controlled substance charge, she was conditionally allowed to be released from jail for treatment. However, Clarissa left treatment on March 28 before being successfully discharged, and her whereabouts were unknown by the Department at the time of trial. Nemec understood that there was now a warrant out for Clarissa's arrest. Nemec believed that Clarissa was aware of the consequences of prematurely leaving treatment, because Nemec had discussed the matter with Clarissa in the 10 days prior to Clarissa's leaving St. Monica's.

Nicole Lemke supervised the family's caseworker since October 2020. She testified to the Department's concerns that Clarissa had been using methamphetamine and to the risk of harm for David and Cameron. Lemke stated that caretakers that are using methamphetamine have challenges making decisions and processing information clearly. They often put their need for the drug above the needs of the children. Methamphetamine users can be awake for days at a time and then experience a "crashing" where they sleep for several days, leaving the children functionally unattended. Additionally, children could come into contact with the substance or ingest it.

Although Clarissa was ordered to complete a psychological evaluation and parenting assessment, these evaluations were not set up by the Department because Nemec was unaware of Clarissa's location during much of the case and because of Clarissa's erratic behavior during meetings while she was incarcerated. It was always the Department's priority to get Clarissa into treatment so she could be sober. Nemec noted

- 589 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF CAMERON L. & DAVID L.
Cite as 32 Neb. App. 578

that a clinician would want to have a baseline sobriety level to ensure an accurate assessment.

Clarissa has not had parenting time with her children since her visitation was suspended by court order in October 2020. In January 2021, Clarissa was permitted by the juvenile court to have therapeutic parenting time with David and Cameron as arranged by the Department, as once recommended by the children's therapist. While Clarissa was in treatment, her therapist at St. Monica's was in communication with the children's respective therapists and established that Clarissa was sober and mentally stable enough to participate in therapeutic visitation. A meeting was scheduled for Clarissa to meet with the children's therapists and to be screened for therapeutic contact with the children. However, this meeting never occurred, because Clarissa left St. Monica's a few days before the scheduled meeting.

Clarissa also had not acquired a residence or a legal means of income, and the last time she participated in a drug test was in April 2021.

### (b) Placement Efforts

Clarissa expressed to Nemec her desire for the children to be placed in a Native American home. Nemec asked Clarissa for recommendations regarding David's and Cameron's placement. Clarissa recommended her mother; however, Clarissa's mother was "on the central registry," and the Department's policy prevented the placement of the children in the home of someone on the registry. From the records Nemec reviewed, it appeared that Clarissa's mother had been provided with information regarding how to have her central registry status expunged, but she had not taken the steps to do so. Clarissa also recommended that David and Cameron be placed with her oldest daughter, Autumn L., who was 19 years old at the time. However, Autumn's home was too small to accommodate placement of the children, and during a preplacement visit, Autumn allowed unauthorized contact between Clarissa and David and Cameron.

- 590 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF CAMERON L. & DAVID L.
Cite as 32 Neb. App. 578

Nemec testified that at the time, the Department did not have other Native American homes available for placement of the children. Nemec stated that when the Department was attempting to place Qlani and Dazianna in out-of-home care, there was only one Native American home available. However, this placement for Qlani and Dazianna did not last. Nemec discussed with that Native American family whether they were willing to take David and Cameron instead, but the placement was primarily interested in having teenagers and had availability for only one more child at that time. The Department case plan dated April 26, 2021, also details the Department's completing a "common referral" in search of Native American placements for David and Cameron. The Department received several responses regarding available placements, including David and Cameron's current foster home, but none were Native American homes.

After the preplacement visit with Autumn, the Department placed David and Cameron into a non-Native American foster home. David and Cameron have been in their most recent non-Native American foster home since May 2021. Nemec stated that as time progressed and the children became increasingly stable in that home, the Department did not consider moving the children from that environment.

Since September 2022, Nemec emailed the "ICWA tribe" monthly updates regarding the children and the juvenile case but had not received any response. Except for "a few phone calls that are random," no other contact between Nemec and the Tribe occurred.

### (c) Children's Needs and Services

Throughout the case, the children have participated in therapeutic services. David has attended weekly individual therapy with Jordan Graham since November 2021. Cameron attended individual therapy with Olivia Christensen, a provider in the same office as Graham, from November 2021 until November 2022. Cameron then began to meet with

- 591 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF CAMERON L. & DAVID L.
Cite as 32 Neb. App. 578

Suzanne Jouvenat in December 2022. Before Clarissa left St. Monica's, the Department was working with Graham and Jouvenat to assess and prepare David and Cameron for therapeutic parenting time with their mother. Graham had been willing to provide therapeutic visitation for the family.

Christensen, a licensed mental health practitioner, testified that she provided weekly child-parent psychotherapy (CPP) to Cameron for 1 year. Christensen described CPP as trauma-based programming for children ages 5 and under that helps children who have experienced any type of trauma or serious mental health concerns build a healthy attachment with a caregiver. Christensen facilitated CPP with Cameron and her foster parents.

When Christensen first began seeing Cameron, she was hyperactive, had trouble concentrating, and was avoidant of indicating any of the trauma she had suffered. Cameron also exhibited an avoidant attachment style and was distant from her foster parents in CPP sessions. Cameron often opted for independent play and would not seek out connection with a caregiver if she was experiencing any dysregulation. However, toward the end of Christensen's time treating Cameron, she observed Cameron building more of a secure attachment. Cameron began to seek out hugs and include the foster parents in her play during sessions. Christensen also observed an improvement in Cameron's coregulation skills.

Christensen had never seen Cameron with Clarissa and was unable to determine what kind of attachment style Cameron had to her mother.

Nemec testified that David and Cameron were also participating in sibling visitation with their older sisters: Qlani, Dazianna, and Autumn. However, the sibling visitation was challenging to facilitate because the Department had a sparsity of providers who were able to accommodate the availability and schedules of everyone involved in the visitation, including the various foster parents.

- 592 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF CAMERON L. & DAVID L.
Cite as 32 Neb. App. 578

David and Cameron's foster mother testified that the children had been placed in her and her husband's home for the past 2 years. When the children first came into their care, they had lice, poor dental health, and clothing filled with holes. David and Cameron also struggled with following directions and respecting authority. The children's behaviors later improved after participating in therapy, and the foster parents set behavioral boundaries and a routine. Both children were presently doing well educationally and socially.

The foster mother testified to preparing a cultural plan prior to taking placement of David and Cameron. The foster parents sought out books and television shows that featured Native American protagonists and storylines, went to museums and Native American stage performances, and took a trip to South Dakota so that the children could visit their place of birth. The foster mother testified to her effort to maintain contact between David and Cameron and their siblings, but she noted that the visits had been challenging logistically and that the children were highly emotional and experienced sleep disturbances following the sibling visits.

Nemec testified that children need permanency, because it develops their self-esteem and allows them to feel safe so that they can continue to develop cognitively, emotionally, and physically. Nemec believed that it would be in David's and Cameron's best interests to achieve permanency as soon as possible, given that they had been in an out-of-home placement for over 3 years. Nemec testified that David's and Cameron's permanency goal at the time of trial was "concurrent guardianship and adoption." The Department's most recent case plan, dated March 22, 2023, stated that while the primary permanency plan for David and Cameron was guardianship, due to the pending motion to terminate Clarissa's and the father's parental rights, the Department had "shifted the goal to [a]doption given the children's young ages." Later in the case plan, the Department refers to adoption as the "alternative plan."

- 593 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF CAMERON L. & DAVID L.
Cite as 32 Neb. App. 578

Nemec also believed that it was in David's and Cameron's best interests to have Clarissa's parental rights terminated. Nemec noted that Clarissa had over 3 years to address her substance abuse and mental health issues. Though Clarissa had increasingly been able to articulate the reasons why she needed to comply with the dispositional plan, she had not been able to successfully complete any of its components. According to Nemec, Clarissa understood the ramifications of not doing so, and yet, she chose not to complete those services to put herself in a better place to parent or have a relationship with her children.

### (d) Holly Burns' Testimony

Holly Burns, a licensed mental health practitioner, testified that she is a nationally registered child-parent psychotherapist, parent-child interactive therapist, and trauma-focused cognitive behavioralist. She is trained in dialectical behavioral therapy and cognitive behavioral therapy. Burns described her ongoing education and training and stated that she has been practicing for over 10 years.

Regarding her specific experience with the application of ICWA, Burns noted that she biannually "attend[s] ICWA trainings." Burns' resume was received into evidence and states that Burns is a "Certified ICWA expert for the Lancaster County Juvenile Courts." She estimated that 10 percent of her clients are Native American children. Burns has been determined to be a qualified expert witness for ICWA proceedings more than five times in the separate juvenile court of Lancaster County.

As to whether she has any particular tribal affiliation, Burns stated that her great grandmother was a "Pascua [Yaqui] Indian." The Pascua Yaqui Tribe is a federally recognized tribe, though Burns was not enrolled nor eligible for enrollment. Burns explained that she was familiar with the customs of the "Yuki natives" who originated in Mexico and then migrated to New Mexico and Texas. Burns speaks "the native

- 594 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF CAMERON L. & DAVID L.
Cite as 32 Neb. App. 578

language of Spanish" and was raised with the understanding that "children are treasures." Burns also has an aunt through marriage whose grandfather was a member of the Tribe. When asked on cross-examination whether Burns' education and training dealt specifically with the culture of the Tribe, Burns responded that her aunt "was of the Oglala Sioux Nation so I have personal experience and I think that far outweighs a classroom experience in my opinion, humbly."

Burns had never met David, Cameron, or Clarissa, though she had been provided collateral information prior to trial, including the Department's court reports and risk assessments, police reports, and the legal filings in the juvenile case. Burns understood from the collateral sources that while David and Cameron were not placed in a Native American foster home, the Department had made efforts to locate a Native American home for the children after their removal. However, Burns understood that the children's grandmother's home was too small to accommodate them and other family members who were considered did not pass a background check. There was also a general search for Native American placements, but Burns could not recall how many Native American homes the Department had explored for placement options.

Burns also received information provided by the children's foster mother regarding her and her husband's efforts to connect David and Cameron to their Native heritage. Burns testified that she believed the foster parents were doing their best but may need further education to "understand that not all Natives are the same, and that there needs to be more focus and emphasis given to the [Tribe]." Burns recommended that the children participate in "Native language courses" and maintain sibling contact with their older sisters to stay connected to their cultural identity. Burns also recommended various organizations that could provide additional resources to the foster parents.

Burns believed that, taking into account Native American culture and standards as they pertain to the protection of

- 595 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF CAMERON L. & DAVID L.
Cite as 32 Neb. App. 578

children, the Department utilized appropriate services for the family. However, Burns observed that "cultural emphasis" may have been more effective with the parents, such as substance use programming based on Native American traditions, for example, "Red Road to Recovery" and the "Medicine Wheel" programs. Burns testified that Clarissa's suspected methamphetamine use and physical behavior that led to the children's removal is not condoned by Native American culture.

Regarding Clarissa's engagement with the juvenile case, Burns stated that Clarissa "participated in a level that she was able to, however, I don't know that it was at a standard that could be seen as acceptable and involved." Additionally, the following exchange occurred:

[The State:] Have you developed an opinion as to whether placing David and Cameron back in their home environment would likely cause serious emotional and physical damage to them?

[Burns:] Again, with the parents' level of participation and lack of participation in services, it would appear that the core issues that resulted in the children being removed would remain the same, and so therefore, I don't know that anyone can make an opinion other than there's still ongoing issues.

Q Okay, and is it your understanding that the whereabouts of both parents are unknown at this time?

A Yes, that was my understanding.

Q So, placing David and Cameron back in their parents' care is not feasible at this moment, correct?

A Correct.

Q Okay, if they were, what would your concerns be as far as the potential for emotional and physical damage to them?

A Again, when I, when I look at children, I look at the effects that trauma has on their development. Given the acute generational and chronic trauma, we know that there would be significant impact on their social and

- 596 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF CAMERON L. & DAVID L.
Cite as 32 Neb. App. 578

emotional wellbeing and propensity for their own mental health and addiction issues given the family's history.

Q And given that the events that led to the removal were also [Clarissa's] hitting or being aggressive to one or more of the children, would that cause you concern that physical damage may occur as well?

A Yes.

Q And you have not been —

A Actually, I should say physical harm, I don't know physical damage.

Burns further testified that she was aware that David and Cameron had been in out-of-home placement since February 2020 and noted that a lack of permanency contributed to developmental trauma for children generally.

### 3. Order

At the conclusion of the termination trial, the juvenile court stated that it found that the State had proved the counts included in the motion to terminate parental rights by clear and convincing evidence, "as well as beyond a reasonable doubt as to the ICWA allegations."

The juvenile court entered an order on April 19, 2023, terminating Clarissa's and the father's rights to David and Cameron. The court found that the State had met its burden of proving that both parents had abandoned the children for 6 months or more immediately prior to the filing of the petition, that there was substantial and continuous neglect, and that the children had been in out-of-home placement for 15 or more months out of the most recent 22 months, pursuant to § 43-292(1), (2), and (7). The parents had also subjected the children to the aggravated circumstance of abandonment pursuant to § 43-292(9). The court also found that pursuant to § 43-292(6), Clarissa had failed to correct the conditions that led to the children's being adjudicated under § 43-247(3)(a). The court further found that "as proven by qualified expert testimony," the continued custody by Clarissa and the father

- 597 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF CAMERON L. & DAVID L.
Cite as 32 Neb. App. 578

was likely to result in serious emotional or physical damage to the children. The court determined that Clarissa and the father were unfit parents and that it was in the best interests of David and Cameron to have Clarissa's and the father's parental rights terminated.

Clarissa appeals from this order. An amicus curiae brief was filed jointly by the Nebraska Indian Child Welfare Coalition and the American Civil Liberties Union of Nebraska.

### III. ASSIGNMENTS OF ERROR

Clarissa assigns, reordered, that the juvenile court erred by (1) terminating her parental rights without a finding beyond a reasonable doubt, supported by qualified expert testimony, that the continued custody of the children by the parent was likely to result in serious emotional or physical damage to the children; and (2) finding that the termination of Clarissa's parental rights was in the children's best interests.

### IV. STANDARD OF REVIEW

[1] An appellate court reviews juvenile cases, including those under NICWA, de novo on the record and reaches its conclusions independently of the juvenile court's findings in a termination of parental rights case. See, *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021); *In re Interest of Phoebe S. & Rebekah S.*, 11 Neb. App. 919, 664 N.W.2d 470 (2003).

### V. ANALYSIS

#### 1. QUALIFIED EXPERT WITNESS TESTIMONY

Clarissa first assigns that the juvenile court erred by terminating her parental rights without a finding beyond a reasonable doubt, supported by qualified expert testimony, that the continued custody of the children by the parent was likely to result in serious emotional or physical damage to the children. She argues that the State's expert witness lacked many of the qualifications required of an expert witness under ICWA and NICWA. She also argues that the juvenile court

- 598 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF CAMERON L. & DAVID L.
Cite as 32 Neb. App. 578

failed to make findings beyond a reasonable doubt, because the court's order was vague as to the standard of evidence applied to its various findings. Before addressing Clarissa's assigned error, we discuss the legal framework used to define a qualified expert witness under ICWA.

[2] To terminate parental rights, it is the State's burden to show by clear and convincing evidence both that one of the statutory bases enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Mateo L. et al., supra*.

[3] NICWA adds two additional elements the State must prove before terminating parental rights in cases involving Indian children. *In re Interest of Audrey T.*, 26 Neb. App. 822, 924 N.W.2d 72 (2019). First, the State must prove by clear and convincing evidence that active efforts have been made to prevent the breakup of the Indian family and that these efforts have proved unsuccessful. *Id*. See Neb. Rev. Stat. § 43-1505(4) (Reissue 2016). Second, the State must prove by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child. *In re Interest of Audrey T., supra*. See § 43-1505(6).

We note that although Clarissa has not assigned any error with respect to the juvenile court's findings that the State proved by clear and convincing evidence that active efforts had been made to prevent the breakup of the Indian family and that those efforts were unsuccessful, we have reviewed the record and find no plain error as it relates to that element. Thus, we turn to Clarissa's specific alleged error.

Clarissa first argues that the State failed to present evidence from a qualified expert under the ICWA standards. Nebraska appellate courts have previously relied on guidelines promulgated by the federal Bureau of Indian Affairs to determine whether a witness qualifies as an expert under ICWA. See *In re Interest of C.W. et al.*, 239 Neb. 817, 479

- 599 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF CAMERON L. & DAVID L.
Cite as 32 Neb. App. 578

N.W.2d 105 (1992), *overruled on other grounds, In re Interest of Zylena R. & Adrionna R.*, 284 Neb. 834, 825 N.W.2d 173 (2012). Those guidelines recognized the following categories of individuals as likely to meet the requirements of ICWA:

"(i) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices.

"(ii) A lay expert witness having substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural standards in childrearing practices within the Indian child's tribe.

"(iii) A professional person having substantial education and experience in the area of his or her specialty."

239 Neb. at 824, 479 N.W.2d at 111, quoting Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,854, 67,593 (1979) (not codified).

NICWA was enacted in 1985 and most recently amended in 2015. The purpose of NICWA is to clarify state policies and procedures regarding the implementation of ICWA in Nebraska. Neb. Rev. Stat. § 43-1502 (Reissue 2016). NICWA includes a definition of "[q]ualified expert witness" that is similar to these federal guidelines, including "[a]ny other professional person having substantial education in the area of his or her specialty." See Neb. Rev. Stat. § 43-1503(15)(e) (Reissue 2016).

In 2016, the Bureau of Indian Affairs issued formal regulations and new guidelines discussing the implementation of ICWA. With respect to the expert witness requirement, the formal regulations provide as follows:

(a) A qualified expert witness must be qualified to testify regarding whether the child's continued custody by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child and should be qualified to testify as to the prevailing social and

- 600 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF CAMERON L. & DAVID L.
Cite as 32 Neb. App. 578

cultural standards of the Indian child's Tribe. A person may be designated by the Indian child's Tribe as being qualified to testify to the prevailing social and cultural standards of the Indian child's Tribe.

(b) The court or any party may request the assistance of the Indian child's Tribe or the [Bureau of Indian Affairs] office serving the Indian child's Tribe in locating persons qualified to serve as expert witnesses.

(c) The social worker regularly assigned to the Indian child may not serve as a qualified expert witness in child-custody proceedings concerning the child.

Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38,778, 38,873 (June 14, 2016) (codified at 25 C.F.R. § 23.122 (2022)). The Nebraska Supreme Court has held that these 2016 federal ICWA regulations must be followed by Nebraska courts. See *In re Interest of Manuel C. & Mateo S.*, 314 Neb. 91, 988 N.W.2d 520 (2023), *modified on denial of rehearing* 314 Neb. 580, 991 N.W.2d 305.

[4] In her brief on appeal, Clarissa concedes that Burns' testimony was received "without objection." Brief for appellant at 33. Typically, to preserve a claimed error in admission of evidence, a litigant must make a timely objection that specifies the ground of the objection to the offered evidence. See *Richardson v. Children's Hosp.*, 280 Neb. 396, 787 N.W.2d 235 (2010). Burns is presumably the only expert witness whose testimony the State sought to qualify, as the two workers from the Department are precluded from being qualified expert witnesses under ICWA. See 25 C.F.R. § 23.122(c). Nevertheless, in our de novo review, we must determine whether there was sufficient evidence to support termination of Clarissa's parental rights under the more rigorous ICWA standards, which require testimony from a qualified expert witness. Thus, we must examine whether Burns was qualified to present expert testimony in this case.

[5] A trial court is allowed discretion in determining whether a witness is qualified to testify as an expert, and unless the

- 601 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF CAMERON L. & DAVID L.
Cite as 32 Neb. App. 578

court's finding is clearly erroneous, such a determination will not be disturbed on appeal. *In re Interest of Ramon N.*, 18 Neb. App. 574, 789 N.W.2d 272 (2010). Burns testified that she is a licensed mental health practitioner, nationally registered child-parent psychotherapist, parent-child interactive therapist, and trauma-focused cognitive behavioralist. She has been a clinician for over a decade and is trained in both dialectical behavioral therapy and cognitive behavioral therapy. The juvenile court's termination order identified Burns as a qualified expert witness and found, as proved by her testimony, that continued custody by Clarissa was likely to result in serious emotional or physical damage to the children.

Based on Burns' professional credentials, which show that she has "substantial education in the area of his or her specialty," we cannot say that the district court abused its discretion in finding Burns to be a qualified expert witness for the purposes of ICWA. See, 25 C.F.R. § 23.122; § 43-1503(15)(e).

Clarissa argues that Burns was not qualified to be an expert witness, because she has not interacted with David, Cameron, or Clarissa. Clarissa points to the recent ICWA guidelines that recommend the qualified expert witness "be someone familiar with that particular child." See U.S. Dept. of Interior, Bureau of Indian Affairs, Guidelines for Implementing the Indian Child Welfare Act G.2 at 55 (Dec. 2016).

While Burns had not met any family members in this case, she had received and reviewed extensive collateral information. Included in this collateral information was Clarissa's psychiatric diagnoses, criminal history, and parental challenges. Burns also reviewed the information concerning the children's diagnoses and therapy. While it may be a better practice for an expert witness to be personally familiar with the children at the center of a juvenile case, given that Burns has a background in family systems and child trauma, and had reviewed collateral information about these children, she was qualified to provide expert testimony here. The Nebraska Supreme Court has permitted clinicians who rely on collateral

- 602 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF CAMERON L. & DAVID L.
Cite as 32 Neb. App. 578

information rather than on interactions with the children for the basis of their testimony to be a qualified expert witness in proceedings where ICWA applied. See *In re Interest of Walter W.*, 274 Neb. 859, 744 N.W.2d 55 (2008).

Clarissa also argues that Burns lacked the qualifications to testify as to the prevailing social and cultural standards of David and Cameron's tribe. The State appears to argue in its brief on appeal that Burns was qualified to speak to Native American cultural customs but concedes that "[t]he only area where [Burns] may be limited is specific knowledge regarding [the Tribe]." Brief for appellee at 27.

As established above, the 2016 federal ICWA regulations state that a qualified expert witness must be qualified to testify regarding whether the child's continued custody by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child and should be qualified to testify as to the prevailing social and cultural standards *of the Indian child's Tribe*. See 25 C.F.R. § 23.122(a).

David and Cameron are eligible for enrollment in the Tribe; thus, only the prevailing social and cultural standards of that tribe are relevant to this case. Though Burns testified to having Pascua Yaqui Indian heritage and being raised with the values of that tribe, she stated that her only experience with the social and cultural standards of the Tribe came from a personal relationship with an aunt through marriage whose grandfather was a member of the Tribe. Burns testified that she attends biannual ICWA trainings, and her resume noted that she is a "Certified ICWA expert for the Lancaster County Juvenile Courts"; however, no additional information regarding these qualifications are in our record, such as the dates of the trainings, topics covered, or the name of the certifying organization. Though Burns testified that Clarissa's suspected methamphetamine use and reported hitting of the children was not condoned by Native American culture generally, based on the record before us, Burns is not qualified to testify to

- 603 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF CAMERON L. & DAVID L.
Cite as 32 Neb. App. 578

the prevailing social and cultural standards of David and Cameron's specific tribe.

However, in its more recent guidelines, the Bureau of Indian Affairs provides, in part:

> The rule does not, however, strictly limit who may serve as a qualified expert witness to only those individuals who have particular Tribal social and cultural knowledge. The rule recognizes that there may be certain circumstances where a qualified expert witness need not have specific knowledge of the prevailing social and cultural standards of the Indian child's Tribe in order to meet the statutory standard.

U.S. Dept. of Interior, Bureau of Indian Affairs, Guidelines for Implementing the Indian Child Welfare Act G.2 at 54 (Dec. 2016) (providing minimum federal standards regarding compliance with 25 C.F.R. § 23.122 governing who may serve as qualified expert witness). Given the circumstances of this case, we find that Burns' lack of specific knowledge of the prevailing social and cultural standards of the Tribe did not prevent her from providing expert testimony.

The Nebraska Indian Child Welfare Coalition and the American Civil Liberties Union of Nebraska, in their amicus brief, encourage this court to adopt the Alaska Supreme Court's holding that qualified expert witness testimony regarding social and cultural standards is "a default requirement rather than a mere suggestion." See *State v. Cissy A.*, 513 P.3d 999, 1012 (Alaska 2022).

The Bureau of Indian Affairs' more recent guidelines note that "ICWA displaces [s]tate laws and procedures that are less protective," but in the instances where states have passed "their own laws applying to child welfare proceedings involving Indian children that establish protections beyond the minimum [f]ederal standards," the "more protective [s]tate law applies." U.S. Dept. of Interior, Bureau of Indian Affairs, *supra*, A.1 at 7.

- 604 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF CAMERON L. & DAVID L.
Cite as 32 Neb. App. 578

We decline to go beyond the plain language of the 2016 federal regulations that state a qualified expert witness as to ICWA "must" be qualified to testify regarding the likelihood of serious emotional or physical damage to the child and "should" be qualified to testify as to the prevailing social and cultural standards of the Indian child's tribe. See 25 C.F.R. § 23.122. NICWA has not been amended since the codification of the most recent federal ICWA regulations and contains no mandatory provision regarding the expert witness' qualifications to testify concerning the relevant tribal social and cultural standards. Should Nebraska seek to establish protections beyond the minimum federal standards, such is the purview of our Legislature.

Clarissa next argues that Burns did not actually give an opinion that continued custody of the child by the parents was likely to result in "serious emotional or physical damage" to the children involved, as required by ICWA and NICWA.

Burns testified to her concern that continued custody of the children by Clarissa may cause the children physical harm, rather than physical damage. However, when asked about the likelihood of emotional damage, Burns testified that David and Cameron had suffered acute generational and chronic trauma and that continued custody by Clarissa would result in a "significant impact on their social and emotional well-being and propensity for their own mental health and addiction issues."

We conclude that Burns was properly qualified to provide expert witness testimony and did so regarding whether David's and Cameron's continued custody by Clarissa was likely to result in serious emotional damage to the children.

Finally, Clarissa argues that the order terminating her parental rights to David and Cameron failed to make a finding beyond a reasonable doubt that continued custody of the children by the parent or Indian custodian was likely to result in serious emotional or physical damage to the children. While the termination order did not use the specific language

- 605 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF CAMERON L. & DAVID L.
Cite as 32 Neb. App. 578

above, the juvenile court did find that the ICWA allegations were proved beyond a reasonable doubt. This assignment of error fails.

## 2. STATUTORY GROUNDS
### FOR TERMINATION

The juvenile court found that the State had presented clear and convincing evidence to satisfy § 42-292(1), (2), (6), (7), and (9). Clarissa does not challenge the juvenile court's finding that statutory grounds to terminate have been met. However, because our review is de novo, we address this requirement for termination of parental rights.

[6,7] Section 43-292(7) allows for termination when the juvenile has been in an out-of-home placement for 15 or more months of the most recent 22 months. It operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Kenna S.*, 17 Neb. App. 544, 766 N.W.2d 424 (2009). In a case of termination of parental rights based on § 43-292(7), the protection afforded the rights of the parent comes in the best interests step of the analysis. *In re Interest of Kenna S., supra*.

Here, it is undisputed that the children have been in out-of-home placement for 15 or more months of the most recent 22 months. David and Cameron were removed from Clarissa's care on February 14, 2020. The State filed its motion for termination of parental rights on January 18, 2023, and the termination trial was held in April 2023. The children remained out of the home since their removal in February 2020. At the time the State filed its motion for termination of parental rights, the children had been out of the home for 35 months. See *In re Interest of Jessalina M.*, 315 Neb. 535, 997 N.W.2d 778 (2023) (existence of statutory basis alleged under § 43-292(7) should be determined as of date petition or motion to terminate is filed). Thus, the statutory requirement for termination under § 43-292(7) has been met.

- 606 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF CAMERON L. & DAVID L.
Cite as 32 Neb. App. 578

[8] If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). Because the State presented clear and convincing evidence that the children had been in an out-of-home placement for 15 or more months of the most recent 22 months, statutory grounds for termination of Clarissa's parental rights exists.

### 3. Parental Unfitness and Best Interests

Clarissa assigns that the juvenile court erred in finding that she was an unfit parent and that it was in the children's best interests to terminate her parental rights. Clarissa asserts that the termination of her parental rights was not necessary as David's and Cameron's permanency goal throughout the case had been guardianship.

[9-11] In addition to proving a statutory ground, the State must show that termination of parental rights is in the best interests of the children. See, § 43-292; *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must show that the parent is unfit. *In re Interest of Jahon S., supra*. There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. See *id*. This presumption is overcome only when the State has proved that the parent is unfit. *Id*. Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id*.

- 607 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF CAMERON L. & DAVID L.
Cite as 32 Neb. App. 578

[12-14] The best interests analysis and the parental fitness analysis are fact-intensive inquiries. And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id*. In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Becka P. et al., supra*. In cases where termination of parental rights is based on § 43-292(7), appellate courts must be particularly diligent in their de novo review of whether termination of parental rights is in fact in the child's best interests. *In re Interest of Becka P. et al., supra*.

Throughout the case, Clarissa's greatest barriers to reunification were her mental health and substance use. Clarissa completed a substance use evaluation at the psychiatric hospital in January 2021, while she was incarcerated, which recommended that Clarissa attend a co-occurring intensive outpatient treatment program. However, soon after starting intensive outpatient treatment, Clarissa reported to her provider that she was "hungover" and had recently used substances. In a February 2021 letter to the Department, Clarissa's provider diagnosed her with social anxiety disorder, unspecified trauma and stressor related disorder, and various substance use disorders, and the provider recommended that Clarissa participate in short-term residential treatment.

Clarissa did not address her substance use again until she participated in a co-occurring evaluation in February 2023 while she was again incarcerated. Clarissa entered St. Monica's for residential substance use treatment in late February 2023, per the recommendation of her co-occurring evaluation. Clarissa had an outstanding warrant connected to a controlled substance charge, and she was conditionally allowed to be released from jail for treatment. Clarissa understood the consequences of prematurely leaving treatment because Nemec had discussed the matter with Clarissa. Nevertheless, Clarissa

- 608 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF CAMERON L. & DAVID L.
Cite as 32 Neb. App. 578

left treatment before being successfully discharged and her whereabouts were unknown by the Department at the time of trial.

Clarissa's decision to leave St. Monica's was even more consequential because while Clarissa was in treatment, her therapist had been in communication with the children's respective therapists and established that Clarissa was sober and mentally stable enough to participate in therapeutic visitation with David and Cameron. Clarissa had not had parenting time with her children since her visitation was suspended by court order in October 2020. A meeting had been scheduled for Clarissa to meet with the children's therapists and to be screened for therapeutic contact with the children. However, this meeting never occurred because Clarissa left St. Monica's a few days before the scheduled meeting.

Clarissa has failed to accomplish any part of her dispositional plan. Clarissa has not successfully completed the recommendations of her substance use evaluation or her co-occurring evaluation. Clarissa was ordered to complete a psychological evaluation and parenting assessment, but these evaluations were not set up by the Department, because Nemec was unaware of Clarissa's location during much of the case and her behavior was erratic when she was incarcerated. Clarissa also has not acquired a residence or a legal means of income. She has not participated in drug testing for the last 2 years.

Clarissa did not seek assistance for her addiction unless she was incarcerated, and even still, she decided to leave treatment early. She did so while the family's therapists were in the process of coordinating therapeutic visits between Clarissa, David, and Cameron, and knowing that her premature exit from treatment would result in a warrant for her arrest. Clarissa lost not only her opportunity for treatment but also an opportunity to see David and Cameron for the first time in over 2½ years.

[15] Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests

- 609 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF CAMERON L. & DAVID L.
Cite as 32 Neb. App. 578

of the child require termination of the parental rights. *In re Interest of Zanaya W. et al.*, 291 Neb. 20, 863 N.W.2d 803 (2015). Based on the evidence presented, there has been minimal change in Clarissa's behavior over the course of the case, and based on Clarissa's lack of engagement with the case and her children, she is unlikely to change in the future. The case plan goals have remained consistent throughout the case and have not been met, and there has been no improvement in Clarissa's ability to parent.

[16] Further, Nebraska courts have recognized that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Octavio B. et al.*, 290 Neb. 589, 861 N.W.2d 415 (2015). David and Cameron have been in foster care since February 2020. Burns testified that a lack of permanency may contribute to their developmental trauma. They deserve stability in their lives and should not be suspended in foster care when Clarissa is unable to rehabilitate herself. Accordingly, we find there was clear and convincing evidence to show that Clarissa was unfit and that terminating her parental rights was in the children's best interests.

## VI. CONCLUSION

The juvenile court properly found that evidence existed to support termination of Clarissa's parental rights to David and Cameron under § 43-292(7) and that termination of her parental rights was in the children's best interests. The State established through evidence, including testimony of qualified expert witnesses, beyond a reasonable doubt, that the continued custody of David and Cameron by Clarissa was likely to result in serious emotional or physical damage to the children. Accordingly, the juvenile court's order is affirmed.

AFFIRMED.