IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF LEO C.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF LEO C., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

ELVIS C., APPELLANT.

Filed March 25, 2025.    No. A-24-578.

Appeal from the County Court for Buffalo County: GERALD R. JORGENSEN, JR., Judge. Affirmed.

Jeffrey P. Ensz, of Lieske, Lieske & Ensz, P.C., L.L.O., for appellant.

Mandi J. Amy, Deputy Buffalo County Attorney, and Jeffrey C. Knapp, guardian ad litem, for appellee.

MOORE, PIRTLE, and WELCH, Judges.

PIRTLE, Judge.

## INTRODUCTION

Elvis C. appeals the order of the Buffalo County Court, sitting as a juvenile court, terminating his parental rights to his minor child, Leo C. Upon our de novo review, we affirm the juvenile court's order.

## BACKGROUND

Elvis and Katie C. are the parents of Leo, born July 2022. They have been married throughout this case. Leo was removed from both his parents on July 29, 2022, when he was a few days old.

- 1 -

On August 1, 2022, the State filed a petition to adjudicate Leo as to both parents pursuant to Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). An amended petition was filed November 1, 2022. The allegations in the amended petition included the following:

> (A) [Leo's parents] failed to follow a safety plan put into place and agreed upon by mother to avoid removal of the child from parents' care, placing said child at risk for harm.

> (B) On or about August 18, 2020, [Leo's parents] relinquished parental rights to a prior born child, to wit: Kadyn [C.], born 2012; following the filing of a termination of parental rights . . . without correcting the reason the child came into the care of [the Nebraska Department of Health and Human Services (DHHS)] after two years of services, and after a year of services addressing parenting, substance use, and domestic violence. . . .

> (C) [Elvis] has charges of Possession of a Controlled Substance (Methamphetamine) with Intent to Distribute pending and it is reported that [Elvis] has been using methamphetamine, placing said child at risk for harm.

> (D) [Leo] had a positive test for cannabis at birth, placing said child at risk for harm.

Elvis admitted to the allegations in the amended petition. Leo was adjudicated as to Elvis on November 1, 2022. Multiple case plans followed and services were provided to Elvis to work toward reunification, including supervised visitation.

On January 25, 2024, the State filed a motion for termination of Elvis' parental rights, alleging statutory grounds existed under Neb. Rev. Stat. § 43-292(2), (4), (6), and (7) (Reissue 2016), and that termination was in Leo's best interests.

A termination hearing was held in April 2024. The evidence showed that when the first petition to adjudicate was filed on August 1, 2022, Elvis was in jail. Before he went to jail, he and Katie were living in an apartment together.

Elvis was released from jail in September 2022 and started an inpatient treatment program for substance abuse. He completed treatment on October 25. After treatment, he lived in a house where he had to maintain his sobriety and follow certain rules. About a month later, Elvis moved back in with Katie for a short time before moving in with his parents. DHHS did not want Elvis and Katie living together due to their history of domestic violence. During much of the case, Elvis reported to his case workers that he was living with his parents, but there were times he admitted he stayed at Katie's apartment two to three times per week.

Elvis testified that he abstained from drugs and alcohol for about a year after treatment. He admitted, however, that he relapsed on drugs in September 2023, and was using drugs for a period in late January 2024 to early February 2024.

Ellen Dutenhoffer supervised visits between Elvis and Leo from December 5, 2022, through March 20, 2023. In early January 2023, Elvis and Katie were having visits with Leo together. The visits were 4 times per week for 5 hours a session. However, in February 2023, Elvis and Katie had a dispute during a visit. After the dispute, Elvis had his own visits with Leo and the hours were reduced from 20 hours a week, to 10 hours per week.

Dutenhoffer testified that the visits between Elvis and Leo went well. She could see a bond between them. Elvis was "very affectionate, very patient, and they had a lot of fun together." Another visitation worker who supervised four visits between Elvis and Leo in April and July

2023, testified that she did not have any concerns during the visits. Elvis and Leo interacted and played together, and Leo was excited to see Elvis. She believed the interaction was positive.

Kaylee Andersen began supervising visits between Elvis and Leo in late August 2023. Andersen testified about some concerns she had during visits. She testified that at a visit on September 10, 2023, Elvis was manic and in a paranoid state and was pacing back and forth. He was ranting about the Kearney Police Department, the court system, DHHS, Katie, and Katie's parents. At one point, he made suicidal comments. He also took off his ankle monitor. Andersen told Elvis she was ending the visit and he began "angrily pacing" and yelling that he did not want Leo to leave. After this incident, the visits moved from Katie's apartment to the visitation agency's office.

Andersen also testified it was common for Elvis to leave the room at the agency's office during a visit to go smoke or go to the bathroom, leaving Leo with her. He would be in the bathroom for 15 minutes and when he came back, he would "seem more excited, fidgety, paranoid." Andersen testified about a specific incident on November 26, 2023, where Elvis went outside to smoke and when he came back, he seemed "a little paranoid" and displayed "some odd mannerisms."

On November 18, 2023, there was a different visitation worker supervising a visit between Elvis and Leo and she reported that during the 4-hour visit, Elvis took six bathroom breaks, one of which he was gone for 15 minutes. When he came back after the 15-minute bathroom break, he seemed "more excited, fidgety, distracted." The visitation worker also reported that Elvis could not recognize Leo's emotions. She reported that Elvis tried to get Leo to play with a certain toy and Leo did not like it and was screaming and crying. The visitation worker had to tell Elvis to stop because he continued to try to get Leo to play with the toy.

Elvis defended his behavior at visits. He testified that his agitated or paranoid behavior was caused by side effects of medication and not illegal substances. He testified he never used any drugs during any visits with Leo. He admitted on cross-examination that his behavior could have also been related to his positive drug tests in September 2023.

Andersen further testified that from late August until early December 2023, Elvis was late to one visit and canceled five visits. The last three of the five canceled visits were canceled because Elvis was in jail. Because it was unclear how long Elvis would remain in jail, visitation services were discontinued by the agency. Another agency began supervising visits in January 2024. Elvis had a visit on January 30, 2024. This was his last visit with Leo prior to the termination hearing because he went back to jail on February 4, and was still in jail at the time of the termination hearing.

Andersen testified that Leo and Elvis had positive interactions and bonding time during visits. There were also a couple visits where Leo did not want to leave Elvis.

Jodi Wilke became Elvis' probation supervisor in April 2023. At that time, Elvis had just been sentenced to probation for attempted distribution of a controlled substance (methamphetamine), resisting arrest, attempted possession of a controlled substance (methamphetamine), operating a motor vehicle to avoid arrest, and obstructing a peace officer. Elvis' probation terms included submitting to random tests for illegal substances 12 times per month. However, he was incarcerated from April 24 to June 12, 2023, so he did not test during that time. After he was released, he was testing regularly, but on September 6, he tested positive

for methamphetamine. On September 27, he tested positive for methamphetamine and amphetamine. Wilke also testified that between September 2023 and December 2023, Elvis was in and out of jail serving custodial sanctions and/or was incarcerated for new law violations.

Elvis tested positive for cannabis on January 18, 2024, followed by four unexcused missed tests between January 22 and February 3. On February 5, while in jail, he admitted to cannabis, methamphetamine, and alcohol use.

Wilke testified that Elvis was still on probation and had probation violations pending at the time of the termination hearing. During the time Wilke had been his probation officer, Elvis had served custodial sanctions in jail numerous times, serving between 5 and 20 days for each violation.

Bryce Riessland performed a substance abuse and mental health evaluation of Elvis in September 2022. Riessland testified that Elvis has a long history of substance use. His substance use included alcohol, cannabis, and methamphetamine. Riessland diagnosed him with post-traumatic stress disorder, anxiety, and intermittent explosive disorder. He testified that post-traumatic stress disorder and intermittent explosive disorder can be exacerbated by drug use.

After the evaluation, Riessland recommended residential treatment, which Elvis completed. Riessland then began providing outpatient treatment/counseling for Elvis. Elvis was supposed to meet with Riessland on a weekly basis, but his attendance had been inconsistent, particularly toward the end of 2023. Riessland had not had much contact with Elvis since October 2023. He was aware that Elvis had a relapse around that time and believed Elvis would likely need to go through another inpatient treatment program, followed by a halfway house program, which could last up to 6 months.

Rebecca Konate has been Elvis' caseworker since August 30, 2022. When she was assigned the case, she learned that Elvis had a prior history with DHHS, which included Kadyn being removed, followed by DHHS providing services, and Elvis relinquishing his parental rights. The juvenile case involving Kaydn began in December 2018. Kaydn was removed due to a history of domestic violence, substance use, and failure to follow safety plans created by DHHS. The State filed a motion for termination of parental rights in June 2020, and Elvis relinquished his parental rights in August 2020.

Konate testified that DHHS has provided various services in Leo's case. She acknowledged that Elvis completed a parenting class, a substance abuse and mental health evaluation with Riessland, and inpatient treatment. Konate noted that Elvis had been on probation throughout the case.

One of the case plan goals was for Elvis to have a stable living environment. Konate did not feel he had ever met this goal. He reported that he was consistently employed throughout the case but switched jobs several times. At the time of the termination hearing, she thought Elvis still had a job, but he had not been working because he had been incarcerated.

Throughout the case there were concerns of domestic violence between Elvis and Katie. Konate testified that visits were separate because DHHS did not want Leo in the middle of their arguing and fighting. Elvis and Katie's relationship was "back and forth" and it was hard to keep track if they were together or not. Elvis and Katie had each filed for divorce in the past and subsequently dismissed the filing. Both parents have also filed multiple protection orders against each other.

Konate testified that when Elvis is sober and stable, he does well with Leo. She did not believe Elvis had demonstrated an ability to continuously provide care and stability for Leo. She opined that it was in Leo's best interests to terminate Elvis' parental rights based on his inconsistency with housing and employment, the number of times he was incarcerated throughout the case, and the inconsistency of being able to provide for Leo's care on an ongoing basis.

The juvenile court entered its order on June 28, 2024, terminating Elvis' parental rights. It found that all the statutory grounds alleged had been met and the termination of Elvis' rights was in Leo's best interests.

## ASSIGNMENTS OF ERROR

Elvis assigns that the juvenile court erred in finding (1) the State proved statutory grounds to terminate his parental rights by clear and convincing evidence and (2) that termination of his parental rights was in Leo's best interests.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id.*

## ANALYSIS

*Statutory Grounds.*

The motion for termination of parental rights alleged that statutory grounds existed under § 43-292(2), (4), (6), and (7). The juvenile court found that the State proved all the statutory grounds alleged. Elvis argues that the State did not prove subsections (2), (4), and (6), but does not argue that subsection (7) was not satisfied.

For a juvenile court to terminate parental rights under § 43-292, it must find that one or more of the statutory grounds listed in this section have been satisfied and that such termination is in the child's best interests. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). The State must prove these facts by clear and convincing evidence. *Id.*

Subsection (7) allows for termination when the juvenile has been in an out-of-home placement for 15 or more months of the most recent 22 months. It operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Becka P. et al., supra.* In a case of termination of parental rights based on § 43-292(7), the protection afforded the rights of the parent comes in the best interests' step of the analysis. *In re Interest of Becka P. et al., supra*.

Leo was removed from the home on July 29, 2022. Since the date Leo was removed, he has never returned to Elvis' care and has remained in out-of-home placement. At the time the State filed the motion for termination of parental rights on January 25, 2024, Leo had been placed outside the home for 18 months out of the most recent 22 months. Therefore, Leo had been out of the home for more than 15 of the most recent 22 months; the statutory requirement for termination under § 43-292(7) has been met.

If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Becka P. et al., supra.* Because we find that the State presented clear and convincing evidence that a statutory ground to terminate existed under § 43-292(7), we need not address the other statutory grounds.

*Best Interests.*

Elvis next assigns that the juvenile court erred in finding that it was in Leo's best interests to terminate his parental rights. Under § 43-292, in addition to providing a statutory ground, the State must show that termination of parental rights is in the best interests of the child. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must show that the parent is unfit. *Id.* There is a rebuttable presumption that the best interests of the child are served by having a relationship with his or her parent. *Id.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id.* The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts. *Id.*

Elvis argues that there were no physical safety concerns at visits and that "all evidence regarding Elvis's parenting of Leo showed the existence of a beneficial relationship where Elvis was a doting father who understood and responded to Leo's needs." Brief for appellant at 16. We do not deny that there was evidence of a beneficial relationship between Elvis and Leo and that visits went well when they occurred. However, there is other evidence regarding Leo's best interests that must be considered.

First, we note that Elvis' visits have been supervised throughout the case. They have never progressed to unsupervised and have primarily occurred at the office of the visitation agency. His scheduled visits have often been disrupted by his recurrent time in jail. For instance, his visitation ended in late 2023 due to his incarceration. Visits restarted in January 2024 and he had one visit before going back to jail on February 4. He had not had a visit with Leo since January 30, 2024, because he was still in jail at the time of the hearing on April 1.

Second, Elvis has a long history of substance abuse and it continued to be a problem. His substance abuse was a problem in the previous juvenile case involving Kaydn and was unresolved at the time Elvis relinquished his parental rights to Kaydn. In Leo's case, Elvis completed inpatient treatment in October 2022 and he claimed he abstained from drug use for a year, but he relapsed in September 2023. On September 6, he tested positive for methamphetamine, and on September 27, he tested positive for methamphetamine and amphetamine. He also admitted using drugs in late January to early February 2024. He tested positive for cannabis on January 18, 2024, which was 3 days after the motion for termination was filed. Further, after going back to jail on February 4, he admitted to cannabis, methamphetamine, and alcohol use. Based on Elvis' continued use of

illegal substances, Riessland testified that Elvis would likely need to go through another inpatient treatment program followed by a half-way house program, which could last up to 6 months. This would result in Leo being suspended in foster care for another extended period.

Third, Elvis has been unable to perform his parental obligations throughout the case because he has been in and out of jail. Wilke testified that Elvis had served custodial sanctions in jail numerous times, serving between 5 and 20 days for each violation. She specifically testified that he was in jail April 24 to June 12, 2023, and that between September and December 2023 he was in and out of jail serving custodial sanctions and was incarcerated for new offenses. Elvis was also in jail shortly after Leo was born in July 2022. He was in jail at the time of the termination hearing in April 2024 and had probation violations pending. Therefore, he continued to be unable to perform his parental obligations.

Although incarceration alone cannot be the sole basis for terminating parental rights, it is a factor to be considered. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). And although incarceration itself may be involuntary as far as a parent is concerned, the criminal conduct causing the incarceration is voluntary. See *id.* Thus, in a case involving termination of parental rights, it is proper to consider a parent's inability to perform his or her parental obligations because of incarceration. *Id.* Elvis' continuous violations of probation and new law violations prevented him from being able to exercise his parental duties and obligations for Leo and there is no indication that he would be able to parent Leo in the future.

Fourth, throughout the case there were concerns about the relationship between Elvis and Katie, which had also been a concern in Kaydn's case. Konate testified that visits were separate because DHHS did not want Leo in the middle of their arguing and fighting. She also stated that Elvis and Katie's relationship was "back and forth" and it was hard to keep track if they were together or not. Both of their probation officers recommended that they not live together or have contact. Elvis and Katie had each filed for divorce in the past but did not go through with it, and each have filed protection orders against the other.

Between substance abuse, probation sanctions, and continued law violations leading to incarcerations, and an unstable relationship with Katie, Elvis has been unable to demonstrate that he can parent Leo. Konate testified that she did not believe Elvis had demonstrated an ability to continuously provide care and stability for Leo. She opined that it was in Leo's best interests to terminate Elvis' parental rights based on his inconsistency with housing and employment, the number of times he was incarcerated throughout the case, and the inconsistency of being able to provide for Leo's care on an ongoing basis. We agree.

Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Cameron L. & David L.*, 32 Neb. App. 578, 3 N.W.3d 376 (2024). Further, Nebraska courts have recognized that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *Id.* Elvis has failed to put himself in a position to properly parent Leo. Leo has been suspended in foster care since July 2022, when he was only a few days old. He is now well over 2 years old and deserves stability and security in his life. He should not be suspended in foster care when Elvis is unable to rehabilitate himself. Accordingly, we find there was clear and convincing evidence to show that Elvis was unfit and that terminating his parental rights was in Leo's best interests.

## CONCLUSION

We conclude the State proved by clear and convincing evidence that grounds to terminate Elvis' parental rights existed under § 43-292(7) and that termination of his parental rights was in Leo's best interests. The juvenile court's order is affirmed.

AFFIRMED.