IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF AMAYA S.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF AMAYA S., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

SEARA H., APPELLANT, AND EARL S., APPELLEE.


Filed December 9, 2025.    No. A-25-294.


Appeal from the County Court for Keith County: JAMES M. WORDEN, Judge. Affirmed.

Robert S. Harvoy for appellant.

Rory J. Roundtree, Deputy Keith County Attorney, for appellee State of Nebraska.

Steven E. Elmshaeuser, guardian ad litem, for appellee Amaya S.


RIEDMANN, Chief Judge, and MOORE and BISHOP, Judges.

RIEDMANN, Chief Judge.

## I. INTRODUCTION

Seara H. appeals from the order of the county court for Keith County, sitting as a juvenile court, that terminated her parental rights to her daughter, Amaya S. Amaya's father relinquished his parental rights and will not be further discussed. Seara has other children, but the only issue in this appeal is her parental rights to Amaya. Seara's other children will be discussed only as necessary. Following our review, we affirm the judgment of the county court.

## II. BACKGROUND

### 1. PROCEDURAL HISTORY

The Nebraska Department of Health and Human Services (DHHS) received an intake related to Amaya's birth, as she had tested positive for THC. On October 11, 2022, days after her birth, Amaya and her half-brother who was one year older, were removed from Seara's care. Amaya was adjudicated in July 2023 but her half-brother was not, and he was returned to Seara's care. Our record does not disclose why opposite results were reached. When a second adjudication attempt was made in June 2024, the court dismissed the petition following a hearing in which the State's evidence was focused primarily on Seara's actions toward this child during visitation with Amaya. It concluded that although Seara's shortcomings would be relevant in a review hearing, they did not support an adjudication of the child, in part because they were observed in an environment which may not reflect their one-on-one interaction at home.

In September 2024, the State filed a petition to terminate Seara's parental rights to Amaya under Neb. Rev. Stat. § 43-292(2), (4), (6), and (7) (Reissue 2016). The termination hearing took place in January 2025, following which the county court terminated Seara's parental rights to Amaya.

### 2. EVIDENCE AT TERMINATION HEARING

#### (a) Goals and Strategies

The goals and strategies DHHS set forth in the case plan remained the same throughout the case. Seara's three goals were to (1) work with DHHS, service providers, and local resources to show she can consistently provide for her children's needs, including educational, medical, mental health, behavioral health, and basic needs; (2) work with DHHS, service providers, and medical and mental health care providers to show that she can maintain her mental health and sobriety by using her support system and consistently provide the family's basic needs; and (3) work with DHHS to create a safety network and safety plan to show she will always parent her children in a safe environment, free of violence, and that if she feels any situation start to escalate, she will remove herself and her children from the situation and reach out to her support network for help.

There were several strategies set forth in the case plan under each goal. The strategies to accomplish her first goal were for Seara to (1) have safe and stable housing for herself and her children that included working utilities, food, and a physically safe home; (2) work with the Educational Service Unit to ensure her children are developmentally on target; (3) attend to her children's routine medical needs and follow through with recommendations, including yearly physicals, vision and dental appointments, immunizations, and when/if the children become ill; (4) work with providers on age-appropriate parenting skills and understanding where the development of the children are at and needs of the children as they get older; and (5) complete the Circle of Security parenting class and demonstrate the skills learned.

The strategies for her second goal were for Seara to (1) complete an urgent needs assessment and follow the recommendations, (2) complete a substance abuse evaluation and follow the recommendations, (3) attend a medication management appointment if recommended and take medications for her mental health as prescribed, and (4) not expose her children to people who are using drugs or are under the influence of drugs. The strategies for her third goal were to (1) identify

and utilize informal and formal supports for her and her children and demonstrate she can provide for her children's needs with these supports and (2) work with family support in regard to healthy relationships.

Overall, Seara's progress throughout the case was minimal. For ease of discussion, we have grouped the evidence presented at the termination hearing on these goals, strategies, and services provided into the categories of mental health, substance use, visitation, and other. We summarize the evidence presented regarding these categories as relevant to our analysis.

*(i) Mental Health*

Seara made little progress related to her mental health. In August 2023, she completed a co-occurring evaluation, and it recommended she attend outpatient therapy. In April 2024, Seara stated she was not attending therapy and did not believe she needed it. In June, she reported she was attending therapy but refused to provide the name of her therapist or sign a release of information. Seara expressed that she had not struggled with her mental health until this case was commenced. At the termination hearing, Seara confirmed she had not shown DHHS proof that she had attended counseling, stating she did not "feel the need to prove to some lady, because she took classes, that I am talking to somebody. I don't want her to have my information. You guys already messed up my life enough." She expressed frustration at being told she had "behavioral issues or mental health, but people that don't even have degrees to tell me that." Seara did begin taking medication and met with a doctor monthly for medication management.

*(ii) Substance Use*

Seara struggled with substance use, specifically THC. She was unable to achieve consistently negative drug patch tests. The July 2024 case plan included information that Seara was pregnant and had stated she planned to stop using THC 3 months before she gave birth so the child would not test positive. Seara entered a treatment program in August 2024 but left before completing treatment. She later stated that she did not have a substance abuse problem and only went to the treatment facility because the web site of the facility said they would get children placed there within 30 days. The only drug patch test result DHHS received after Seara left the facility was negative.

In December 2024, Seara expressed that she noticed when she used THC, things would be overstimulating and irritating to her as a parent. But in January 2025, Seara acknowledged smoking marijuana, and stated that she did not have a problem. At the termination hearing, when discussing her sobriety, Seara stated that "[y]ou can't make me stop smoking something that's legal right here in Nebraska."

*(iii) Visitation*

Visits remained supervised throughout the case, and Amaya remained in out-of-home placement since her October 2022 removal. Seara attended only 23 percent of visits between January and March 2024. In February 2024, Seara stated she did not have time to attend visits, do other things, and still be able to have time for herself to do what she wanted. At one point, Seara disagreed with visitation notes provided by family support workers and refused to participate in visits unless she could record them. The company supervising visits had a policy against this, and

in May the county court ordered DHHS to attempt to find a visitation company that would allow recording. Visits were changed to virtual in August as Seara began residing in a treatment facility in Omaha. Seara was inconsistent with virtual visitation as she preferred it to be in-person. Once Seara left the treatment facility in October, in-person visits resumed and visits were more consistent with no safety concerns noted.

### (iv) Other

Seara completed a Circle of Security parenting class. She struggled to maintain consistent housing and employment. At the time of the termination hearing, Seara was residing with her father, who would not allow DHHS workers into the home without a warrant. Seara disputed that she had struggled to maintain consistent housing, stating that she and her children had always had a roof over their heads. She believed that throughout the case, she had lived in four different places. Seara stated she had been employed at various times, but because DHHS expected her to respond to messages and phone calls, it was difficult to maintain employment. She also stated that it was difficult to get a job when she was required to attend numerous visits.

Seara participated in Intensive Family Reunification (IFR) services, designed to help parents with mental health, basic needs for children, and reunification, from September 2023 to March 2024. IFR is typically a 12-week program, but Seara was granted an extension for additional time. However, services were discontinued in March due to Seara's lack of engagement. When asked about some of the IFR reports, Seara disputed them and stated that the information came from people "CPS pay to lie for them."

### (b) Amaya

Amaya's foster parents reported that after resuming in-person visitation with Seara in late 2024, Amaya had been more emotional, irritable, and angry, and that it was difficult to soothe her. A January 2025 child-parent assessment noted that Amaya was not as explorative with Seara in the room and that during the separation and reunion portion of the assessment, Amaya did not seem to care that Seara left or returned to the room. A clinical social worker stated that children should not linger in foster care and that children need to know who their caregiver is going to be. Without this knowledge, children can struggle to develop healthy attachments and are at greater risk for struggles with issues like mental health, substance use, running away, and being involved in the juvenile justice system. DHHS' opinion was that it was in Amaya's best interests for Seara's parental rights to be terminated.

### 3. COUNTY COURT ORDER

The county court terminated Seara's parental rights to Amaya. It found that the State had shown a statutory basis for termination under § 43-292(7). The county court found Seara was an unfit parent for Amaya, and that it was in Amaya's best interests for Seara's parental rights to be terminated.

### III. ASSIGNMENT OF ERROR

Seara assigns that there was not sufficient evidence to support a finding that termination of parental rights was in the best interests of Amaya, as required by § 43-292.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id*.

## V. ANALYSIS

Seara assigns that there was not sufficient evidence to support a finding that termination of her parental rights was in the best interests of Amaya, as required by § 43-292. To terminate parental rights, it is the State's burden to show by clear and convincing evidence both that one of the statutory bases enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Cameron L. & David L.*, 32 Neb. App. 578, 3 N.W.3d 376 (2024).

### 1. STATUTORY BASIS

Although Seara assigns only that the evidence was not sufficient to support a finding that termination of her parental rights was in Amaya's best interests, in our de novo review we will address whether the State met the statutory basis for termination. Section 43-292(7) states that the court may terminate all parental rights between the parents and a juvenile when the court finds that "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." This section operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. See *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021).

Here, the evidence showed that Amaya was removed from Seara's home in October 2022 and never returned to her care. The petition to terminate Seara's parental rights was filed in September 2024. At that point, Amaya had been in out-of-home placement for approximately 23 months. This was sufficient to meet the requirements of § 43-292(7); therefore, a statutory basis for termination was proven by clear and convincing evidence.

### 2. BEST INTERESTS

In addition to proving a statutory ground, the State must show that termination of parental rights is in the best interests of the child. *In re Interest of Cameron L. & David L., supra;* see also § 43-292. A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must show that the parent is unfit. *In re Interest of Cameron L. & David L., supra.* There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id*. This presumption is overcome only when the State has proved that the parent is unfit. *Id*. Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id*.

The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id*. And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id*. In proceedings to terminate parental rights, the law does not require perfection of a

parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *Id*.

The goals and strategies in Seara's case plan remained the same throughout the case. Although Seara took a parenting class, engaged in medication management, and had no safety concerns at recent visits, overall, she made minimal progress toward her goals.

Seara did not initially attend therapy because she did not feel it was necessary, and when she did begin therapy, she refused to provide information about it. She blamed the State for her mental health struggles. Seara planned to stop using THC only while pregnant so that the baby would not test positive at birth. Seara entered a treatment program, left before completing treatment, and later stated she did not have a substance problem and went to the facility only because it had said it could get children placed within 30 days. Seara said that when she used THC, she noticed things could be irritating to her as a parent. But she later acknowledged smoking marijuana and stated she did not have a problem. At the termination hearing, Seara said the State could not make her stop smoking something that was "legal."

Visits remained supervised throughout the entire case, and Seara once stated that with visits and other tasks she had no time for herself. She attended only 23 percent of visits between January and March 2024, and visits were then disrupted when Seara insisted on recording them, requiring DHHS to find another provider. Although Seara always had housing, it was not consistent, and she struggled to maintain employment. She was residing with her father, who refused to allow DHHS workers into the home without a warrant. IFR services were provided for an extended period but were later discontinued due to Seara's lack of engagement. At the termination hearing, Seara disputed IFR reports and claimed that "CPS" paid people to lie for them.

Amaya became more emotional, irritable, and angry, as well as difficult to soothe, after in-person visits resumed in late 2024. A January 2025 child-parent assessment noted that Amaya was not as explorative with Seara in the room and that during the separation and reunion portion of the assessment, Amaya did not seem to care that Seara had left or returned to the room. There was testimony that lingering in foster care without knowing who their caregiver is can cause children to struggle in a variety of ways.

Seara was ordered to leave the courtroom on the first day of the termination hearing because she could not control her outbursts. Throughout the case, she expressed distrust of DHHS workers and other service providers. The county court noted that "[a] certain amount of distrust is to be expected. Unfortunately, [Seara's] conspiratorial view of the case is one reason she failed to make any measurable progress." Seara's distrust of DHHS workers or other service providers, prevented her from working with them to meet her case plan goals to regain custody of Amaya. Seara loves Amaya, but throughout the case she proved unwilling to place Amaya's needs first, and this created a serious barrier to reunification.

We acknowledge that at times throughout this case, including at the time of the termination hearing, Seara's other children were in her custody. Although Seara's relationship with, and care of, her other children was discussed at trial and considered by the county court, her inability to progress through the case plan established for reunification with Amaya provides clear and convincing evidence that Seara is unfit to care for her. Seara has shown she is not willing to change her behavior or utilize the resources at her disposal to place herself in a position to parent Amaya. Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time,

the best interests of the child require termination of the parental rights. *In re Interest of Cameron L. & David L.*, 32 Neb. App. 578, 3 N.W.3d 376 (2024). Nebraska courts have recognized that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. See *id*. Amaya needs permanency, and it is unclear when Seara will be willing to take steps to provide it. We find Seara unfit and termination of her parental rights to be in Amaya's best interests.

## VI. CONCLUSION

The State proved by clear and convincing evidence that a statutory basis for termination exists, that Seara is unfit, and that termination of Seara's parental rights is in Amaya's best interests. We affirm the judgment of the county court.

AFFIRMED.