IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF KEAIRA T. ET AL.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF KEAIRA T. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

DEONTE B., APPELLANT, AND ISMAIL B., APPELLEE, AND

SHAE B., APPELLEE AND CROSS-APPELLANT.

Filed April 21, 2026.    No. A-25-567.

Appeal from the Separate Juvenile Court of Lancaster County: SHELLIE D. SABATA, Judge. Affirmed.

Joy Shiffermiller, of Shiffermiller Law Office, P.C., L.L.O., for appellant.

Jeremy P. Lavene, Deputy Lancaster County Attorney, for appellee State of Nebraska.

Jonathan M. Braaten and Ashton E. Koch, of Anderson, Creager & Wittstruck, P.C., L.L.O., for appellee and cross-appellant Shae B.

Michelle Paxton, of Children's Justice Clinic, guardian ad litem.

RIEDMANN, Chief Judge, and BISHOP and WELCH, Judges.

RIEDMANN, Chief Judge.

## I. INTRODUCTION

Deonte B. appeals, and Shae B. cross-appeals, the order of the separate juvenile court of Lancaster County terminating their parental rights to their three children. Following our review, we affirm the judgment of the juvenile court.

- 1 -

## II. BACKGROUND

Deonte and Shae are the natural parents of three children: Kendal B., born in October 2018; Kassious B., born in November 2019; and Kelani B., born in May 2021. Shae's three older children are named in this action, but they and their father are not involved in this appeal and will not be discussed. All references to "children" in this opinion refer to only Kendal, Kassious, and Kelani.

The children were found to be within in the meaning of Neb. Rev. Stat. § 43-247(3) (Cum. Supp. 2024) in November 2023, based on allegations against Shae. They were found to be within the meaning of § 43-247(3) in August 2024, based on allegations against Deonte. On April 2, 2025, the State moved to terminate Deonte and Shae's parental rights, alleging bases existed to terminate their parental rights under Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016). The following is a summary of the evidence presented at the termination hearing that is relevant to the assigned errors on appeal and cross-appeal.

### 1. REMOVAL AND ADJUDICATIONS

The children were removed from Shae's care on October 23, 2023, when emergency services were called to Shae's home due to smoke. Shae appeared very confused, incoherent, and lethargic, and did not know what day it was. The smoke was caused by food burning on the stove. Kendal, Kassious, and Kelani were removed from Shae's care and placed with Deonte's mother. There were some discussions that Deonte might eventually be able to take custody of the children.

In April 2024, a supplemental petition alleging the children were at risk of harm due to Deonte's actions was filed, alleging in part that he had been arrested in February for possession of a controlled substance. This petition was later amended to include allegations that Deonte had been charged with possession of a controlled substance in June and that there was risk of harm to the children due to an incident that occurred on April 28. On that date, less than an hour before a visit with the children, Deonte was stopped by police. It was alleged that Deonte possessed marijuana, was driving with a suspended license, and was driving under the influence of drugs, though Deonte claimed he was not under the influence. In August, the children were found to be within the meaning of § 43-247(3) due to Deonte's actions.

The family had three different case workers from the Nebraska Department of Health and Human Services (DHHS) throughout the case. Celine Jones began managing the case on May 30, 2024, and remained case manager at the time of the termination hearing.

### 2. COURT ORDERS

Although the children were adjudicated at different times as it related to Deonte and Shae, their court orders following the adjudications were mostly the same. Initially, Shae was ordered to complete a co-occurring evaluation and cooperate with drug testing.

Over time, the juvenile court added to these orders. Briefly summarized, Deonte and Shae were ordered to: sign releases of information as necessary; report changes in contact information, maintain contact with DHHS and attend family team meetings; participate in supervised visitation with the children; obtain and maintain safe, stable, and sober living environments; maintain employment or legal means of support; report any law enforcement contact; cooperate with family support; not discuss certain matters with the children; not possess, use, or consume alcohol or

drugs not prescribed by a medical professional; and participate in random drug testing. They were also ordered to address any outstanding warrants.

In August 2024, Deonte was ordered to complete a co-occurring evaluation, and later a child-parent psychotherapy (CPP) dyadic assessment. Later in the case, Shae was ordered to participate in individual therapy and to complete an updated co-occurring evaluation. In February 2025, Shae's parenting time was changed from supervised to therapeutic.

### 3. PROGRESS ON ORDERS

#### (a) Deonte

Prior to the supplemental petition being filed, Deonte participated in supervised parenting time, family support, had obtained housing and full-time employment, and was working to furnish his home. On April 28, 2024, Deonte was stopped by police as described above. Deonte denied being under the influence but later admitted to having a "little bit" of alcohol in his system and to smoking marijuana.

Deonte's visits with the children had been moved to monitored, but due to the April 2024 incident, they returned to being fully supervised. In October, Deonte tested positive for alcohol and cocaine the same day he was scheduled to have a visit with the children. That same month, DHHS received an intake alleging the children were spending the night at Deonte's residence unsupervised, contrary to court orders. As a result, they were removed from Deonte's mother's care and placed with another relative.

After entering short term residential treatment in April 2025, Deonte was unable to participate in visitation due to the treatment facility's policies. He was incarcerated on May 15, remained so at the time of the termination hearing, and had been unable to resume visitation. When Deonte and the children did have visits, two of the children experienced behavioral issues the day of and/or the day after visits. Since visits had stopped, the children did not frequently ask if there would be visits and were not exhibiting the behavioral issues that had accompanied visits.

Deonte completed a co-occurring evaluation but followed only one of the recommendations. The evaluation recommended individual therapy, drug testing, CPP, batterer's intervention, and family support. Deonte engaged in drug testing but did not want to participate in batterer's intervention. Deonte did not engage in CPP as ordered by the court and recommended by the evaluation. Deonte was discharged from family support because of nonengagement. He was also incarcerated for brief periods of time in February, June, July, and November 2024. This was due in part to probation violations, but also other charges such as possession or theft.

Deonte successfully completed intensive outpatient treatment on March 13, 2025. However, on March 30, he reported to his transitional living space and appeared under the influence. Staff located two "shooter" bottles of alcohol among his items. The next day, Deonte tested positive for alcohol, cocaine, methamphetamine, and amphetamine. In April, he participated in an updated drug and alcohol evaluation, where he reported that he saw a moderate need for alcohol treatment but did not see a need for drug treatment.

#### (b) Shae

In January 2024, Shae completed a co-occurring evaluation. When Jones was first assigned to the case in May, Shae had also obtained her own home and was starting to furnish it, and she

was participating in family support. Although Shae maintained communication with DHHS, she failed to follow through with statements that she was going to participate in services.

Shae reported numerous barriers to her progress to Jones, but when Jones attempted to remove the barriers, Shae would not engage. She did not engage with her family support worker and was discharged after attending only 4 of 10 scheduled appointments. After being discharged by her therapist in May 2024, Shae expressed interest in returning to therapy. DHHS reengaged services, but Shae was discharged less than 3 months later for lack of engagement. Shae had been ordered to address her outstanding warrants, but at the time of the termination hearing in June 2025, she still had warrants and was unable to attend the hearing. Shae struggled to comply with drug testing, and at one point was discharged due to lack of engagement. She did not participate in drug testing from April 15 to January 3, 2025.

Shae was discharged from two visitation agencies for failing to confirm or attend supervised parenting visits. Shae had a visit with the children in May 2024 but did not see the children again until January 2025 and provided no explanation for the lack of visits. Following the January 2025 visit, Kassious stated that Shae told him if he had an emergency while living with his foster parents, he would get to live with Shae. The next day, Kassious beat his head on a door until it bled and asked if it was an emergency so that he could live with Shae. Shae was discharged from the visitation agency following this visit as there were concerns that she had been under the influence.

In October 2024, Shae was ordered to complete an updated co-occurring evaluation, but to do this she needed to contact Medicaid and adjust her coverage. Despite Jones telling Shae that Shae had to contact Medicaid, she repeatedly failed to do so. Shae did not complete the updated evaluation until March 2025, after which she was diagnosed with moderate methamphetamine use disorder, mild cannabis use disorder, bipolar II disorder, posttraumatic stress disorder – chronic, and generalized anxiety disorder. After the updated evaluation, Shae began to participate in modified outpatient treatment but was discharged after less than a month. Shae attended two individual counseling sessions but failed to attend her scheduled group sessions. Shae then came to a group session for which she was not scheduled and did not leave when requested. Instead, she was found in the male restroom with a male client who was also not supposed to be on the premises, and she appeared under the influence.

### 4. CHILDREN

There were previous intakes involving the children and Shae and/or Deonte. A March 2021 intake alleged Deonte and Shae had physically neglected Kendal and Kassious, but the intake was determined to be unfounded because neither Deonte nor Shae could be located. A June intake alleged Shae physically abused Kelani and the intake was found to be court substantiated. After their removal from Shae's care in 2023, Kendal and Kassious had emergency dental appointments, and both had to have root canal surgery due to cavities. In January 2025, Kassious and Kelani were reported to be dysregulated after visits with Deonte. Jones testified that permanency was necessary for the children's development. It would help reduce any type of long-lasting or impacting trauma that might occur in the future. Due to the lack of progress in the case, Jones did not believe reunification with either Deonte or Shae was likely to happen in the near future. Jones opined

Deonte and Shae were unfit to parent the children, and that it was in the best interests of the children to terminate Deonte's and Shae's parental rights.

### 5. JUVENILE COURT ORDER

The juvenile court found the State had proved by clear and convincing evidence that termination was appropriate under § 43-292(2), (6), and (7). It found both Deonte and Shae to be unfit, and that termination of their parental rights was in the best interests of the children. It terminated Deonte's and Shae's parental rights.

## III. ASSIGNMENTS OF ERROR

Deonte and Shae both assign the same errors, which are, combined and restated, that the juvenile court erred in finding a statutory basis to support termination of their parental rights and erred in finding that termination of their parental rights was in the best interests of the children. As the assigned errors are the same in Deonte's appeal and Shae's cross-appeal, we address them together.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

## V. ANALYSIS

### 1. STATUTORY BASIS

Deonte and Shae assign that the juvenile court erred in finding a statutory basis existed to terminate their parental rights. We disagree. To terminate parental rights, it is the State's burden to show by clear and convincing evidence both that one of the statutory bases enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Cameron L. & David L.*, 32 Neb. App. 578, 3 N.W.3d 376 (2024).

Section 43-292(7) states that the court may terminate all parental rights between the parents and a juvenile when the court finds that "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." This section operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. See *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021).

Here, the evidence showed the children were removed from Shae's care in October 2023 and have remained in out-of-home placement since that time. The motion to terminate Deonte and Shae's parental rights was filed in April 2025, when the children had been in out-of-home placement for approximately 17 months. This was sufficient to meet the requirements of § 43-292(7); therefore, a statutory basis for termination was proven by clear and convincing evidence. See *In re Interest of Jessalina M.*, 315 Neb. 535, 997 N.W.2d 778 (2023) (existence of

statutory basis alleged in § 43-292(7) should be determined as of date petition or motion to terminate filed).

Because grounds existed for termination under § 43-292(7), we need not address Deonte's and Shae's arguments that the juvenile court erred in finding termination was appropriate under § 43-292(2) and (6). See *In re Interest of Mateo L. et al., supra*.

## 2. BEST INTERESTS

Deonte and Shae assign that the juvenile court erred in finding that termination of their parental rights was in the best interests of the children. In addition to proving a statutory ground, the State must show that termination of parental rights is in the best interests of the child. *In re Interest of Cameron L. & David L., supra*; see also § 43-292.

A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must show that the parent is unfit. *In re Interest of Cameron L. & David L., supra*. There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id*. This presumption is overcome only when the State has proved that the parent is unfit. *Id*. Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id*.

The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id*. And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id*. In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *Id*.

### (a) Deonte

When the children were first removed from Shae's care, Deonte made progress to put himself in a position where he could take custody of the children. As of April 2024, he had participated in supervised parent time, family support, had obtained housing and full-time employment, and was working to furnish his home. Deonte's visits with the children had moved from supervised to monitored. But on April 28, less than an hour before a visit with the children, he was stopped by police, faced criminal charges, and admitted to having some alcohol in his system and smoking marijuana. In October, Deonte tested positive for alcohol and cocaine on a day he was to have a visit with the children. DHHS was also made aware Deonte was having the children stay overnight with him unsupervised, in violation of the court orders, which led to a change in their placement.

Deonte was unable to have visits with the children after April 2025, because he was in residential treatment, and later, because he was incarcerated. When Deonte and the children did have visits, two of the children experienced behavioral issues the day of and/or the day after visits. Since visits had stopped, the children had only infrequently asked if there would be visits and were not exhibiting the behavioral issues that had accompanied visits.

Deonte failed to follow the recommendations in his co-occurring evaluation, except for drug testing. He did not participate in batterer's intervention, nor in CPP, despite CPP being

court-ordered. He was discharged from family support due to nonengagement. He was also incarcerated at various points throughout 2024. Deonte successfully completed intensive outpatient treatment in March 2025, but less than 3 weeks later tested positive for alcohol, cocaine, methamphetamine, and amphetamine. Alcohol was found with his belongings. Despite this, Deonte reported that he saw only a moderate need for alcohol treatment but did not see a need for drug treatment.

Throughout the case, Deonte had periods when he participated in services and made strides toward reunification. But he was never able to maintain this progress. At the time of the termination hearing, Deonte was further away from reunification than he was when the children were first removed. Deonte has not shown sustained progress or a willingness to comply with court orders. It is unclear when Deonte will be able to attain and maintain the progress necessary to put himself in a position where the children can be safely placed in his care.

### (b) Shae

As of May 2024, Shae had completed a co-occurring evaluation, had housing, participated in family support, and had maintained contact with DHHS. Although she stated she wished to participate in services, once they were arranged, Shae did not engage in them. Although Jones attempted to remove the barriers Shae reported to her progress, Shae failed to take further steps. Shae failed to address her outstanding warrants and could not attend the termination hearing. She did not participate in drug testing from April 2024 to January 2025, and was discharged from a drug testing company and a family support agency due to lack of engagement.

Shae had no visits with the children from May 2024 to January 2025 and provided no reason for failing to see them. She was discharged from two visitation agencies for failing to confirm or attend visits. When Shae finally had a visit with the children in January, it resulted in Kassious engaging in self-harming behavior because Shae had told him if he had an emergency, he could live with her. The visitation agency that supervised the visit discharged Shae because of concerns she had been under the influence.

In May 2024, Shae expressed an interest in reengaging with therapy, but she was discharged less than 3 months after services were started, due to lack of participation. Shae delayed contacting Medicaid to change her coverage, despite Jones repeatedly telling her to do so, which resulted in Shae's updated co-occurring evaluation not being completed until March 2025. After completing the updated evaluation, Shae began modified outpatient treatment. But Shae was discharged less than a month later after not participating in group therapy and being found in the male restroom with a male client when neither were to be on the premises.

Throughout this case, Shae failed to engage in the services at her disposal, some of which she herself had requested. When Shae had to take action on her own toward meeting a court order, such as contacting Medicaid or addressing outstanding warrants, she delayed or failed to act. She has made little progress since the children's removal from her care. It is unclear when Shae will be willing or able to place herself in a position for the children to be safely returned to her care.

### (c) Children

Prior to this case, there had been allegations of neglect and/or abuse of the children. In December 2023, both Kendal and Kassious had such severe cavities that they required root canal

surgery. The children had seen Shae once in the year prior to the termination hearing, and following that visit, Kassious engaged in self-harming behavior. Although the children had participated in visits with Deonte more recently, Kassious and Kelani both experienced dysregulation after visits. Since the children stopped seeing their parents, their behavior has improved, and they have had minimal questions regarding whether visits will occur. Kendal, Kassious, and Kelani have been in out-of-home placement since October 2023. Jones explained that permanency is necessary for the children's development to reduce long-lasting or impacting trauma.

This case was marked by a lack of engagement and sustained progress on the part of Deonte and Shae. The law does not require perfection of a parent, but courts should look for the parent's continued improvement in parenting skills. See *In re Interest of Cameron L. & David L.*, 32 Neb. App. 578, 3 N.W.3d 376 (2024). Here, Deonte initially made improvements but failed to sustain this progress and moved further away from reunification. Shae failed to participate in most services or even see her children in the year prior to the termination hearing. There has been little to no sustained improvement.

Neither parent is close to being ready to have the children safely placed in his or her care, or even to participate in unsupervised visitation. It is unclear when, or if, this will occur. Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Cameron L. & David L., supra*. Nebraska courts have recognized that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. See *id*. We find that both Deonte and Shae are unfit, and that it is in the best interests of Kendal, Kassious, and Kelani to terminate Deonte's and Shae's parental rights.

## VI. CONCLUSION

There was a statutory basis for termination, and the State showed by clear and convincing evidence that both Deonte and Shae are unfit, and that termination of their parental rights was in the best interests of the children. We affirm the judgment of the juvenile court.

AFFIRMED.