IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF JAXSON F. & JAYDEN F.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF JAXSON F. AND JAYDEN F., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

BROOK F., APPELLANT.

Filed June 2, 2026.    Nos. A-25-794, A-25-795.

Appeals from the County Court for Keith County: JOEL B. JAY, Judge. Affirmed.

Steven E. Elmshaeuser for appellant.

Krista Shaul, Special Appointed Keith County Attorney, for appellee.

Robert S. Harvoy, guardian ad litem.

RIEDMANN, Chief Judge, and BISHOP and FREEMAN, Judges.

RIEDMANN, Chief Judge.

## I. INTRODUCTION

Brook F. appeals from the orders of the county court for Keith County, sitting as a juvenile court, that terminated her parental rights to her sons, Jaxson F. and Jayden F. Jaxson's and Jayden's respective cases have been consolidated for purposes of appeal. Brook argues that the court erred by finding termination was in the children's best interests. Following our de novo review, we affirm the orders of the county court.

## II. BACKGROUND

Brook is the biological mother of Jaxson and Jayden, twin boys born in May 2017. The children's paternity has never been established and will not be discussed further.

- 1 -

## 1. Procedural History

Jaxson and Jayden were removed from Brook's care in January 2024 and have remained in out-of-home placement since. After their removal, the State filed petitions under separate cases, alleging that Jaxson and Jayden were children within the meaning Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 2024). Jaxson and Jayden were both adjudicated in March.

In April 2025, the State filed motions to terminate Brook's parental rights to Jaxson and Jayden under Neb. Rev. Stat. § 43-292(2), (4), (6), and (7) (Reissue 2016). It later filed amended termination motions in August, citing the same statutory subsections and clarifying that only Brook's parental rights were at issue.

## 2. Evidence at Termination Hearing

Jaxson's and Jayden's cases were consolidated for purposes of the termination hearing. The termination hearing was held on August 7 and 8, 2025. The following evidence was adduced.

Jaxson and Jayden had previously been removed from Brook's care in 2019. They were in out-of-home care for 26 months prior to being reunified with Brook in February 2022.

In August 2023, the Department of Health and Human Services (DHHS) began receiving intakes concerning the children. Multiple intakes alleged that domestic violence was occurring between Brook and her boyfriend, Kent H. However, the children were not removed from Brook's care until she was arrested in January 2024 and there was no caregiver in the home available for the children.

After Jaxson and Jayden's removal, Brook identified that she was struggling with lack of housing, her mental health, and illegal substance use. Accordingly, the goals DHHS set forth in the case plans required Brook to (1) provide a safe and stable living environment for herself and the children that was free of illegal substance use and violence; (2) provide safe and stable home environment by addressing her mental health; and (3) refrain from any illegal substance use, maintain sobriety for 6 months, and not use substances around the children or allow others to do so.

The case plan strategies included Brook finding safe and stable housing; obtaining and maintaining employment to provide for herself and the children; addressing her mental health by seeing a counselor; completing a substance use evaluation; not partaking in substance use; complying with drug patch testing; attending visitation and being present for Jaxson and Jayden; and being patient with the children and learning to control her emotions and tone when communicating with them. The case plan goals and strategies remained the same throughout the case.

The court also entered orders requiring Brook to participate in drug patch and urinalysis testing and to complete a substance abuse and a co-occurring drug and alcohol evaluation.

The evidence at the termination hearing generally showed that Brook had made no notable progress toward the case plan during the life of the case. Nor did she comply with the court's orders.

### (a) Housing and Employment

Throughout the case, Brook tended to find housing wherever it was available. Shortly before Jaxson's and Jayden's removal, Brook was evicted from her home and DHHS began

providing housing at a local motel. However, in February 2024, the motel asked Brook to leave because the room had been damaged.

In March 2024, Brook was living in Kent's home. This was concerning to DHHS because Brook had reported that Kent had been abusive toward her, Jaxson, and Jayden. Brook lived with Kent until sometime around July, and their relationship eventually ended.

In September 2024, Brook reported she was staying with another man. DHHS was also concerned about this living situation because Brook had previously accused this man of stalking her.

Subsequently, Brook reported to DHHS on multiple occasions that she was living in either Colorado or Nebraska, but she would not provide residential addresses. Specifically, in April 2025, Brook initially reported she was living in Nebraska with two unknown men, but later that she had moved into a trailer with a friend. However, she did not provide an address for the trailer.

Further, despite Brook knowing that she needed employment to sustain housing, she was unemployed for the majority of the case. Although Brook obtained a job in March 2025, she quickly lost the position and remained unemployed from April 30 until the time of the termination hearing. Generally, the evidence showed that Brook never obtained her own stable housing or consistent employment during the case.

### (b) Mental Health

Brook's mental health was identified by DHHS case workers as a significant barrier to her making progress during this case. DHHS contacted Brook's previous mental health counselor, and he agreed to take Brook back as a patient. Brook reached out and began having appointments with him. However, her attendance was sporadic and inconsistent.

Because Brook was inconsistent with attending appointments, her counselor eventually informed her that she would need to fill out paperwork to continue having sessions. DHHS later learned that Brook had not completed the paperwork and contacted her about doing so. Brook informed DHHS that she was presently on her way to the counseling facility to fill out the paperwork, but DHHS discovered afterward that she never showed up.

At the time of the termination hearing, Brook had still not completed this paperwork. She was not seeing a therapist and had not been for several months.

### (c) Substance Use

Brook was first ordered to have a drug patch placed in March 2024. However, Brook did not have a drug patch placed until March 2025. Nonetheless, after having the drug patch placed, Brook did not show up to the scheduled appointment to collect the results. The service provider attempted to contact Brook on five different occasions to facilitate collection of the patch, but Brook never responded. This provider discontinued services in April 2025 because of Brook's noncompliance.

DHHS then made a referral to a new drug patch provider that could meet Brook wherever was most convenient for her, even in multiple different Nebraska towns, or in Colorado, where she was temporarily living. However, Brook never confirmed a time and place to meet with this provider. DHHS subsequently contacted two additional providers, but Brook nonetheless refused to cooperate.

Brook never had another drug patch placed after the one in March 2025. Accordingly, no drug patches were ever collected or submitted for testing throughout the case. Brook also never complied with urinalysis drug testing, nor did she complete the substance abuse or co-occurring evaluations ordered by the court.

(d) Visitation

Brook was initially ordered to participate in supervised in-person visitation with Jaxson and Jayden. However, Brook would often cancel or end visits early. She would also say she was coming to visitation but not show up, even when transportation was provided to her. Jaxson and Jayden were regularly upset because Brook did not show up to visitation or because they were unsure whether she was coming. Brook communicated sporadically with DHHS to the point that it could not facilitate visitation.

Although Brook was incarcerated on and off between March and June 2024, she still did not make efforts to see Jaxson and Jayden when she was not confined. She ultimately stopped participating with in-person visits in March 2024.

In September 2024, a court order formally suspended in-person visits until Brook had two negative urinalysis drug tests within a 1-week period. However, as previously mentioned, Brook did not comply with urinalysis drug testing.

This court order also allowed Brook to have supervised phone calls with Jaxson and Jayden. However, Brook's phone calls with the children were sporadic and, when she did call, it was not at the agreed upon time. The foster family eventually stopped telling the children about the calls because they were never consistent or timely.

Brook did not see Jaxson and Jayden from March 2024 until March 2025, when she began participating in virtual visitation with the children. Virtual visitation occurred every week for 1 hour. There was a plan to increase the frequency and length of visitation if Brook complied with services offered by DHHS, including drug testing. However, visitation never increased during the case.

During a particular virtual visit, the supervised visitation worker attempted to redirect Brook from continuing an inappropriate topic of conversation. Brook became very upset about being redirected, and the visitation worker informed her that, if she was unable to move on from it, the call would be ended. Brook became very emotional and aggressive, and started raising her voice. The visitation worker then hung up the call and the session ended. Afterward, both Jaxson and Jayden reported that they were angry with Brook and did not want to see or talk to her again.

Jaxson and Jayden each underwent a diagnostic interview and trauma assessment in April 2025. During his diagnostic interview, Jaxson exhibited a lot of fear and anxiety and expressed he did not want to see or talk to Brook. He identified Brook as "mean" and said he did not like doing virtual visits or phone calls with her. During Jayden's interview, he also expressed that he did not want to see or live with Brook because she was "still mean." He explained that Brook still yelled at him and his brother and was mean when they spoke to her on the phone or did virtual visits.

Further, Jaxson and Jayden's mental health therapist testified at the termination hearing. She stated that the boys continuously told her that Brook was rude and played favorites between them during visits. The therapist ultimately testified that, in her professional opinion, visitation

with Brook was detrimental to Jaxson and Jayden. She believed virtual visits were causing psychological harm to both boys.

### (e) Jaxson and Jayden

The diagnostic interview and trauma assessment reports stated that both Jaxson and Jayden indicated during their respective interviews that they did not want to return to Brook's custody. The reports also explained that Jaxson and Jayden needed safety, consistency, and permanency, and that making the boys wait for permanency put them at greater risk for long-term effects, including mental health, substance use, attachment, developmental and academic, legal, and relationship issues. According to the reports, neither Jaxson nor Jayden saw Brook as a safe person able to meet his needs.

Additionally, Jaxson and Jayden's therapist testified that Brook was very selfish when interacting with the boys and that they were fearful of her. Further, neither boy had any positive memories of Brook, and they both had indicated they did not want to see her. Ultimately, the therapist testified that, based on her observations and treatment of Jaxson and Jayden, it was impossible for either boy to feel safe and comfortable in Brook's care. According to the therapist, Brook would need to regularly participate in therapy to improve her relationship with the boys.

The DHHS child and family services specialist assigned to the case in September 2024 also testified at trial. He testified that, based on Brook's very limited progress throughout the case, she was incapable of meeting the boys' needs. This DHHS worker ultimately opined that Brook was unable to provide the boys the consistency, safety, and permanency that they needed.

### 3. COURT ORDERS

The county court found clear and convincing evidence that termination of Brook's parental rights was proper under § 43-292(2), (4), (6), and (7). It also found clear and convincing evidence that it was in Jaxson's and Jayden's best interests that Brook's parental rights be terminated. Brook now appeals.

### III. ASSIGNMENT OF ERROR

Brook assigns that there was insufficient evidence to support a finding that termination of her parental rights was in the children's best interests, as required by § 43-292.

### IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id*.

### V. ANALYSIS

To terminate parental rights, it is the State's burden to show by clear and convincing evidence both that one of the statutory bases enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Cameron L. & David L.*, 32 Neb. App. 578, 3 N.W.3d 376 (2024).

## 1. STATUTORY BASIS

Brook's sole assigned error is that the evidence was insufficient to support a finding that termination of her parental rights was in the children's best interests. She does not contest a statutory basis existed to terminate her parental rights.

However, in our de novo review, we address whether the State met the statutory basis for termination. Section 43-292(7) states that the court may terminate all parental rights between the parents and a juvenile when the court finds that "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." This section operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. See *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021).

Here, the evidence showed that Jaxson and Jayden were removed from Brook's care in January 2024, and that they were never returned to her care prior to her rights being terminated. The amended petition to terminate Brook's parental rights was filed in August 2025. At that point, the children had been in out-of-home placement for approximately 18 months. This was sufficient to meet the requirements of § 43-292(7). Therefore, a statutory basis for termination was proven by clear and convincing evidence.

## 2. BEST INTERESTS

Brook assigns that the county court erred in terminating her parental rights because the State failed to prove termination was in Jaxson's and Jayden's best interests. We disagree.

In addition to proving a statutory ground, the State must show that termination of parental rights is in the best interests of the children. *In re Interest of Cameron L. & David L., supra*. A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must show that the parent is unfit. *Id*. There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id*. This presumption is overcome only when the State has proved that the parent is unfit. *Id*. Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id*.

The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id*. And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id*. In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *Id*. In cases where termination of parental rights is based on § 43-292(7), appellate courts must be particularly diligent in their de novo review of whether termination of parental rights is in fact in the child's best interests. *In re Interest of Cameron L. & David L.*, 32 Neb. App. 578, 3 N.W.3d 376 (2024).

Throughout the 18 months that Jaxson and Jayden remained in out-of-home care, Brook frequently refused to disclose to DHHS where she was living, and she changed residences multiple times. Also, even though her relationship with Kent ended, Brook still lived with people who were concerning to DHHS. Brook never obtained her own appropriate and stable housing, or consistent employment, throughout the case.

Moreover, Brook was inconsistent in attending counseling and had stopped completely several months prior to the termination hearing. Also, despite DHHS' efforts to cater to Brook by contacting a plethora of providers—even finding one that would meet at whatever location was most convenient for her—Brook only ever had one drug patch placed, the results of which were never collected. Brook additionally did not comply with urinalysis drug testing or complete the evaluations ordered by the court.

Further, Brook's contact with Jaxson and Jayden was inconsistent throughout their time in out-of-home care. At the outset of this case, Brook's participation with in-person visitation was sporadic and the boys were regularly upset because of Brook's unpredictability. Brook stopped participating in in-person visitation in March 2024.

Although in-person visitation was formally suspended and would only be reinstated if Brook had two negative urinalysis drug tests within 1 week, she still did not comply with drug testing, ultimately making no effort to regain in-person visitation. Brook also only sporadically exercised her right to supervised phone calls during the time she was not seeing the children.

Approximately a year passed before Brook saw Jaxson and Jayden again. And although she participated in virtual visitation beginning in March 2025, Brook never took the necessary steps, such as participating in drug testing, to have more than 1 hour per week of contact with the boys.

Furthermore, both Jaxson and Jayden feared Brook and did not trust her to meet their needs, and neither boy wanted to return to her care. Although the evidence showed that counseling would have helped Brook repair her relationship with Jaxson and Jayden, we have already stated Brook did not regularly participate in counseling during the case, and that she eventually stopped completely. Brook did not take any other action to improve the relationships or earn the boys' trust. Rather, visitation was once ended due to her disagreeable behavior, and she was continuously inconsistent, selfish, and mean to the boys to the point that visitation caused them both psychological harm.

Although the case plan goals and strategies have remained consistent throughout the case, Brook has made little to no progress. Brook has failed to obtain and maintain employment or housing, address her mental health needs, or show that she is not using illegal substances. Additionally, Brook's efforts to have regular contact with the boys while they were in out-of-home care were minimal at best. She did not take the necessary steps to increase visitation—much less have Jaxson and Jayden returned to her care. Brook's parenting skills also did not improve despite the case plan requiring her to work on patience and to control her emotions and tone while communicating with the boys.

Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Cameron L. & David L.*, 32 Neb. App. 578, 3 N.W.3d 376 (2024). The evidence shows that the concerns which existed at the time of Jaxson's and Jayden's removal have not been resolved during the 18 months they have remained in out-of-home care, and Brook's lack of engagement with the case plan and with her children show this is unlikely to change in the future.

Additionally, Nebraska courts have recognized that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. See *id.* Jaxson and Jayden were previously removed from Brook's care in 2019 and remained in out-of-home placement for

26 months before reunification. They were subsequently removed in January 2024 and remained in out-of-home care through the termination hearing held in August 2025.

Jaxson and Jayden need and deserve safety, consistency, and permanency, and we note that the evidence shows being without permanency puts the boys at risk for serious long-term issues. However, based on the record before us, there is no indication that Brook will be able or willing to provide for these needs anytime soon. Jaxson and Jayden have already spent a significant amount of time in out-of-home care, and they should not be made to wait even longer when Brook is unable to rehabilitate herself.

For these reasons, we find the State met its burden to show Brook is unfit and that termination of her parental rights is in Jaxson's and Jayden's best interests.

## VI. CONCLUSION

The State proved by clear and convincing evidence that a statutory basis for termination exists, that Brook is unfit, and that termination of Brook's parental rights is in Jaxson's and Jayden's best interests. We affirm the judgment of the county court.

AFFIRMED.