IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF X'ALAYA C.S. ET AL.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF X'ALAYA C.S. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

YAHSHUA C., APPELLANT, AND DAVON W. AND NATALIA H., APPELLEES.


Filed June 9, 2026.    No. A-25-913.


Appeal from the Separate Juvenile Court of Douglas County: MARY M.Z. STEVENS, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Nicole J. Tegtmeier for appellant.

Cara Stirts, Deputy Douglas County Attorney, for appellee State of Nebraska.


RIEDMANN, Chief Judge, and MOORE and PIRTLE, Judges.

RIEDMANN, Chief Judge.

## INTRODUCTION

Yahshua C. appeals from the order of the separate juvenile court of Douglas County that terminated his parental rights to his children, X'alaya C.S. and Yahshua C.S. He argues that the court erred by finding a statutory basis for termination existed and that termination was in the children's best interests. Following our de novo review, we affirm the order of the juvenile court.

## BACKGROUND

The children are twins born in November 2017. The record shows that the juvenile court proceedings also involved the children's mother, Natalia H., her two other children, and those children's biological father. This appeal, however, involves only Yahshua's parental rights. Therefore, Natalia will be mentioned only for purposes of context.

- 1 -

In April 2023, the State filed an ex-parte motion for immediate custody requesting the children be removed from Natalia's care. That same day, the juvenile court granted the State's motion and the children have remained in out-of-home placement since.

In July 2023, the State filed a petition alleging that the children came within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 2024) due to the fault and habits of Yahshua. Yahshua appeared before the juvenile court in September and admitted to the allegations in the petition that he had failed to provide the children with proper parental care, support, supervision, and/or protection, and that they were consequently at risk for harm. The children were subsequently adjudicated under § 43-247(3)(a) regarding these allegations.

Following a review hearing in April 2024, the juvenile court ordered Yahshua to participate in Department of Corrections (DOC) programming that would prepare him to work toward reunification with the children; send the necessary DOC visitation paperwork to the assigned Department of Health and Human Services (DHHS) child and family services worker, if he wished to participate in supervised visitation with the children; participate in video and phone visits with the children; and sign a release of information form for DHHS to communicate with and gain information from DOC, if he desired to actively participate in the case. In August, Yahshua was also ordered to complete options counseling.

The State then filed a motion in March 2025 to terminate Yahshua's parental rights to the children under Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016). Yahshua entered a denial to the allegations of the motion and a termination hearing was held in July. The witnesses testified to the following evidence.

TERMINATION HEARING EVIDENCE

Yahshua was incarcerated when the children were born but was released in December 2017, when they were approximately 1 month old. However, in 2018, Yahshua was incarcerated again after being convicted of robbery. He was eventually released after serving 2½ years.

Then, in August 2022, Yahshua was incarcerated once more after being charged with possession of a firearm by a prohibited person. Yahshua was convicted of this charge in June 2023 and was sentenced to 8 to 10 years' incarceration. His projected release date is in February 2029, but he will become eligible for parole in August 2027.

DHHS child and family services worker, Katheryn Herdliska, was the case manager between 2023 and 2025. In May 2023, DHHS questioned Natalia about the identity of the children's father, and she responded that their father was Yahshua. Herdliska then conducted multiple searches for Yahshua but was unable to locate him until July 6, when she discovered that he was incarcerated at the Lincoln Reception and Treatment Center (RTC). Thereafter, Herdliska made various attempts to contact Yahshua but was unable to facilitate communication with the RTC staff.

Yahshua was later transferred to the Nebraska State Penitentiary. While he was residing there, Herdliska was able to communicate with Yahshua at a juvenile court hearing held July 31, 2023. She provided Yahshua with her contact and address information and instructed him to fill out DOC visitation paperwork and send it to her office. The visitation paperwork would enable Herdliska to visit and contact Yahshua during his incarceration and to facilitate visitation between

him and the children. However, although Yahshua had written Herdliska's information down, the paper containing the information was confiscated during a search of his cell within 24 hours of the hearing.

In March 2024, the children were removed from their initial foster placement and were placed in the home of Tina Williams. They remained in this placement until the termination hearing.

In April 2024, Herdliska was informed that Yahshua had been transferred back to the RTC. In August, Herdliska called the RTC to inquire about how she could conduct visits with Yahshua. The responding staff informed her that Yahshua was required to submit a visitation request form for Herdliska to be approved as a visitor and then be added to his authorized visitor list. Herdliska was also told that Yahshua was required to approve Herdliska as a visitor before she could work with the facility to arrange any services, including visits between Yahshua and the children.

The RTC staff member reported that they would contact Yahshua's RTC counselor to inform them of Herdliska's call. However, Herdliska was not added to Yahshua's authorized visitor list and did not receive any further communication from Yahshua or his assigned RTC professionals. During her time on the case, Herdliska made three attempts every month to contact Yahshua but was ultimately unsuccessful.

Herdliska believed that, because she had not been approved as a visitor, she was unable to speak with Yahshua or visit him at the RTC. However, Herdliska's belief was mistaken, as professional visits from a DHHS case worker did not require that an inmate complete the visitation request form.

Yahshua was also required to complete a release of information form for Herdliska to communicate with DOC regarding his programming, but Herdliska's perceived inability to speak with or visit Yahshua prevented him from doing so. She had also sent Yahshua a release of information form in the mail. However, Yahshua did not receive mail from her at any point during the case.

Overall, while Herdliska was case manager, Yahshua was unable to participate in supervised in-person or video visitation with the children because Herdliska was mistaken about the paperwork requirement. Additionally, Herdliska never received a completed release of information form from Yahshua, and she was consequently unaware of any programming he had participated in while incarcerated.

Another DHHS child and family services specialist, Sophia Lanphier, took over as case manager in March 2025. That same month, Yahshua completed a release of information form. Also, since Lanphier became the case manager, DHHS had been able to maintain regular contact with Yahshua and he had completed options counseling.

After Yahshua completed the release of information form, Lanphier requested documentation from DOC regarding Yahshua's participation in programming. However, the documents she received from DOC were unresponsive to this inquiry.

Despite the lack of documentation from DOC, Yahshua reported that he had completed some programming while incarcerated. He claimed that his ability to emotionally regulate had consequently improved, and he had learned skills relevant to parenting.

Lanphier had also attempted to coordinate visitation for Yahshua while he was incarcerated. However, although Lanphier had asked Yahshua on several occasions if he would like to have visitation with the children, he refused each time.

Yahshua was told that visitation with the children would need to occur during the 3 hours per day that he was allowed outside of his cell. However, these 3 hours differed month to month and Yahshua used most of this time doing things like cleaning, bathing, and eating. Accordingly, Yahshua explained to Lanphier that his schedule was too unpredictable at the RTC and that he wanted to wait to have visitation until after he was potentially transferred to a different facility.

Ultimately, Lanphier was never able to observe a positive relationship between Yahshua and the children. Yahshua had not seen the children since becoming incarcerated in 2022, and he had no contact with them during the life of the case. Also, since the children began living with Williams, Yahshua had not sent the children any gifts, cards, or letters.

Yahshua testified at the termination hearing that he loved the children and he wished to parent and maintain a relationship with them. Lanphier, however, testified that it was in the children's best interests to terminate Yahshua's parental rights.

### JUVENILE COURT'S ORDER

In November 2025, the juvenile court entered an order finding clear and convincing evidence that termination of Yahshua's parental rights was proper under § 43-292(2), (6), and (7). It also found that Yahshua was unfit, and it was in the children's best interests that his parental rights be terminated. Yahshua now appeals.

### ASSIGNMENTS OF ERROR

Yahshua assigns, restated, that the juvenile court erred by finding (1) a statutory basis existed under § 42-292 to terminate his parental rights and (2) termination of his parental rights was in the children's best interests.

### STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Denzel D*., 314 Neb. 631, 992 N.W.2d 471 (2023). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id*.

### ANALYSIS

To terminate parental rights, it is the State's burden to show by clear and convincing evidence both that one of the statutory bases enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Cameron L. & David L*., 32 Neb. App. 578, 3 N.W.3d 376 (2024).

### STATUTORY BASIS

Although Yahshua assigns that the juvenile court erred by finding a statutory basis existed under § 42-292 to terminate his parental rights, he does not contest that the children were in out-of-home placement for 15 of the most recent 22 months, and he admits that the requirements

of § 42-292(7) were thus met. Regardless, we will address whether the State met the statutory basis for termination per our de novo review.

Section 43-292(7) states that the court may terminate all parental rights between the parents and a juvenile when the court finds that "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." This section operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. See *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021).

Here, the evidence showed that the children were removed from Natalia's care in April 2023, and that they remained in out-of-home care until the termination hearing. The petition to terminate Yahshua's parental rights was filed in March 2025. At that point, the children had been in out-of-home placement for just over 22 months. This was sufficient to meet the requirements of § 43-292(7). Therefore, a statutory basis for termination was proven by clear and convincing evidence.

Because the State needed to prove only one basis for termination, and did so here, we need not further analyze Yahshua's claim that the State failed to show grounds existed to terminate his parental rights under § 42-292(2) and (6). See *In re Interest of Taeson D.*, 305 Neb. 279, 939 N.W.2d 832 (2020).

BEST INTERESTS

Yahshua also assigns the juvenile court erred by finding the State met its burden to show termination of his parental rights was in the children's best interests.

In addition to proving a statutory ground, the State must show that termination of parental rights is in the best interests of the children. *In re Interest of Cameron L. & David L., supra*. A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must show that the parent is unfit. *Id*. There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id*. This presumption is overcome only when the State has proved that the parent is unfit. *Id*. Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id*.

The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id*. And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id*. In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *Id*. In cases where termination of parental rights is based on § 43-292(7), appellate courts must be particularly diligent in their de novo review of whether termination of parental rights is in fact in the child's best interests. *In re Interest of Cameron L. & David L.*, 32 Neb. App. 578, 3 N.W.3d 376 (2024).

Although Yahshua did not make progress with the rehabilitative orders during Herdliska's time as case manager, it appears his lack of engagement with the case was predominantly due to circumstances outside of his control. Herdliska was unable to communicate with RTC staff to facilitate contact with Yahshua, she was mistaken that Yahshua would need to complete visitation

paperwork for her to conduct visits with him, her contact information was confiscated from his cell, and he never received the release of information form she sent through the mail.

Notably, as soon as Lanphier became case manager, Yahshua completed the release of information form, maintained regular contact with DHHS, and participated in options counseling. Additionally, although Yahshua refused Lanphier's offers to coordinate visitation with the children, Yahshua was clearly under the impression that visitation with them was not possible while he was incarcerated at the RTC.

However, irrespective of Herdliska's inability to arrange services or whether Yahshua's schedule prevented visitation, he did not attempt to communicate with the children through any means for over a year prior to the termination hearing. After the children were placed with Williams in March 2024, Yahshua did not send the children any gifts, cards, or letters.

Parental obligation requires a continuing interest in the children and a genuine effort to maintain communication and association with the children. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). Yahshua has not attempted to maintain contact with the children. His actions, or lack thereof, indicate that his continuing interest or genuine effort in having communication with the children is wanting.

Furthermore, it is proper to consider a parent's inability to perform his or her parental obligations due to incarceration even though incarceration alone cannot be the sole basis for termination. See *In re Interest of Lizabella R.*, 25 Neb. App. 421, 907 N.W.2d 745 (2018). Although incarceration itself may be involuntary as far as the parent is concerned, the criminal conduct causing the incarceration is voluntary. See *In re Interest of Zanaya W. et al.*, 291 Neb. 20, 863 N.W.2d 803 (2015).

The record shows that Yahshua knowingly committed multiple crimes since the children were born, which resulted in him being incarcerated. Yahshua was incarcerated in 2018 for a period of 2½ years after being convicted of robbery, and he was sentenced in 2023 to another 8 to 10 years' incarceration after being convicted of possession of a firearm by a prohibited person. Yahshua is presently incarcerated on this charge and will not be released until at least August 2027, assuming he is granted parole.

Yahshua has been incarcerated for the majority of the children's lives, and his deliberate criminal behavior has again placed him in a position where he is unable to parent the children and cannot provide for any of their needs.

Moreover, where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. See *In re Interest of Cameron L. & David L.*, 32 Neb. App. 578, 3 N.W.3d 376 (2024). Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. See *id*.

At the time Yahshua's parental rights were terminated, the children had already been in out-of-home placement for approximately 2½ years. It is apparent from Yahshua's testimony that he loves the children and wants to parent them. However, Yahshua had not seen the children since August 2022 and did not attempt to communicate with them at all throughout this case. Due to his lack of interaction with the children, Yahshua was unable to demonstrate that a positive relationship exists between himself and the children or that he was capable of being an appropriate parent. It is therefore unclear whether he would be able to parent the children outside of incarceration.

Even assuming Yahshua would be able to provide for the children's needs upon his release, they would be required to wait an additional 21 months before Yahshua would be parole eligible in August 2027. There is, however, no guarantee that Yahshua will be granted parole or be released from incarceration at that time. Rather, if he is not granted parole, the children would be required to remain in out-of-home care until at least February 2029.

The children deserve a permanent and stable home environment, which Yahshua is currently unable to provide. And even if he would eventually be able to provide this, the children cannot languish in foster care awaiting Yahshua's release from incarceration at an uncertain date multiple years in the future.

In our de novo review of the record, we find that Yahshua is unfit and that it is in the children's best interests that his parental rights be terminated.

## CONCLUSION

The State proved by clear and convincing evidence that a statutory basis for termination exists, that Yahshua is unfit, and that termination of Yahshua's parental rights is in the children's best interests. We affirm the order of the juvenile court.

AFFIRMED.